UNITED STATES of America,
Plaintiff–Appellee,

v.

Juan Antonio SALAZAR,
Defendant–Appellant.

No. 94–60598.

United States Court of Appeals,
Fifth Circuit.

Sept. 26, 1995.

Dorina Ramos, McAllen, TX, for appellant.

Katherine L. Haden, Asst. U.S. Atty., Paula C. Offenhauser, U.S. Atty., Houston, TX, for appellee.

Before KING, SMITH and STEWART, Circuit Judges.

PER CURIAM:

On March 31, 1994, following a jury trial, Juan Antonio Salazar was convicted of assisting the escape of a federal prisoner and aiding and abetting the knowing use of a firearm during a crime of violence. Salazar appeals his conviction on the firearm charge, arguing that the evidence was insufficient. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 16, 1994, a second superseding indictment was returned against Salazar, charging him with assisting the escape of a person under arrest for a felony in violation of 18 U.S.C. § 752(a) (count two), and aiding and abetting the knowing use of a firearm during a crime of violence in violation of 18 U.S.C. §§ 2, 924(c)(1) (count three). Following a jury trial, Salazar was convicted on counts two and three on March 31, 1994. After the government rested, Salazar's attorney presented a motion for acquittal with regard to count three, on the ground that the government failed to present evidence of Salazar's use of a firearm. The court denied the motion. Following his conviction and sentence, Salazar filed a timely notice of appeal.

Raul Valladares–Del Angel ("Valladares") was incarcerated on charges related to his involvement with over 1000 pounds of cocaine when he escaped from jail on April 18, 1993. Salazar was not present and did not participate in the actual escape. However, the Government produced evidence that Salazar helped plan the escape. The evidence adduced at trial demonstrated the following:

In late March or early April 1993, Alfonso Ibanez ("Ibanez"), an attorney practicing in Hidalgo County, was contacted by a Mexican attorney on behalf of the family of Valladares, who wished to retain him to represent Valladares on drug charges for which he was

being detained at the Hidalgo County Jail in Edinburg, Texas. Ibanez visited Valladares in jail and learned that the case involved over 1000 pounds of cocaine, and that Valladares was already represented by Bobby Joe Yzaguirre. Ibanez obtained Yzaguirre's permission to join the defense team, and he communicated to Valladares's family that he would require a $100,000 retainer to represent Valladares, and also that he would require Valladares's personal agreement for him to participate in the defense. The family agreed to pay the retainer, but needed time to obtain it.

Over the next few weeks, Ibanez visited Valladares in jail two or three times, after working hours, to inquire if Valladares would hire him. Normal visiting hours were 8 a.m. to 8 p.m. on weekends, but attorneys were allowed to visit at any time. Ibanez would call jail personnel before he arrived so that they could find Valladares and bring him to the front of the jail. Ibanez testified that during these visits, Valladares never mentioned Salazar.

On April 18, 1993, Ibanez arrived home from church about 8 p.m.. His son or daughter told him that Raul Valladares, Jr. ("Valladares, Jr."), with one or two other men, had stopped by Ibanez's home to talk about Valladares. About thirty minutes later, Valladares, Jr. returned with one or two other persons and Ibanez met them outside his home. Ibanez tentatively identified Salazar as the individual accompanying Valladares, Jr., but claimed that he could not positively identify him because he did not get a very close look. Ibanez's son, Jaime Ibanez, also testified that Salazar resembled the man who had accompanied Valladares, Jr.. Valladares, Jr. asked Ibanez to tell his father that the man who wanted to buy their ranch was in Reynosa with the money and to inquire what Valladares, Jr. should do about the real estate sale. Because Ibanez believed that the sale of the ranch was for the purpose of obtaining his retainer, he agreed to visit Valladares at the jail that evening.

Ibanez and his wife, Gloria Ibanez, arrived at the jail about 8:30 or 8:45 that evening. While Mrs. Ibanez stayed in the car, Ibanez entered the building, showed his identification and requested to see Valladares. Ibanez described the entrance to the jail as a glass and metal unlocked door which led into a waiting room. The waiting area contained a glass window at which persons could speak to jail personnel about visiting a prisoner. When coming to see a client, Ibanez would approach this window, identify himself as an attorney, and request that his client be brought to the meeting room. A sliding glass door connected the waiting area to the attorney/prisoner meeting room. This door was operated from the control room and would open and close slowly. The control room was surrounded by windows, enabling its occupants to see into the waiting area and the attorney/prisoner meeting room. The attorney/prisoner meeting room was one room containing small cubicles where attorneys could meet with their clients, a bathroom, and two public phones. The attorneys were not separated from the prisoners by glass or any other type of partition. A separate heavy metal door led from the meeting room into the secured area of the jail, which was also operated from the control room, through which the prisoner was escorted to meet with his attorney.

Ibanez entered the attorney/prisoner meeting room through the sliding glass door, and Valladares was escorted in the meeting room through the heavy metal door on the other side. They sat at a table in one of the cubicles. Ibanez relayed the message about the sale of the ranch, but Valladares did not seem to be familiar with the sale. Ibanez tried to call Valladares, Jr. from the public phone in the meeting room, but he could not locate him. Valladares then complained to Ibanez about his new cell arrangements.

Having concluded their meeting, Ibanez and Valladares approached the window to the control room to tell the deputy sheriff they were done. While they waited to be noticed, Ibanez saw a person, later identified as Jose Angel Hernandez–Ochoa ("Hernandez"), enter the building from outside. This person exchanged gestures with Valladares, both men shrugging their shoulders with palms upraised as if to say "what is going on?". Ibanez asked Valladares if he knew this person; Valladares answered that yes, he was a

friend. While Valladares and Hernandez were talking through the window, the sliding glass door opened to allow a deputy and a person in civilian clothes to pass through the meeting room and into the waiting area. While the door was open, Hernandez slipped inside the meeting room. Ibanez directed Valladares and Hernandez (who remained unidentified) to follow him to one of the cubicles, where they continued talking. Deputy Alvarez, who was manning the control room, did not recognize Hernandez, so he called Deputy Perez to watch the control room. Deputy Alvarez entered the meeting room and asked Ibanez if the new individual was a lawyer or investigator with him. Because he was not with Ibanez, the deputy ordered Hernandez to leave the meeting room. At that time, the deputy, Ibanez, Valladares, and Hernandez moved toward the sliding glass door.

As Hernandez moved through the sliding glass door, he told Valladares, "vente," meaning "come on." Valladares then ran through the glass door and followed Hernandez toward the general exit. The deputy and Ibanez tried to grab Valladares as he ran through the glass door, but with no avail. Deputy Alvarez then followed Valladares out the sliding glass door and into the waiting area. As he tried to apprehend Valladares near the general exit, Hernandez pointed a black handgun at him. Deputy Alvarez dropped to the floor and took cover behind a bench. When he looked up, he saw another unidentified man, identified at trial by Hernandez as La Zota, pull what looked like a Coke can out of his left boot, pull the pin, drop it, and exit. Tear gas permeated the room. From the meeting room, Ibanez had lost sight of the men, but he heard a hissing sound, then saw and felt the tear gas coming from the waiting area. The tear gas infiltrated the entire jail, requiring an evacuation. Ibanez had no further contact with Valladares or Valladares, Jr. after the escape. Ibanez testified that the unidentified individual (identified at trial as Hernandez) was not Salazar, and he also averred that he did not see Salazar at the jail on the night of the escape. Deputy Alvarez also testified that he did not see Salazar at the jail on the night of the escape.

While waiting in the car in the jail parking lot, Mrs. Ibanez heard someone say "suete" or "subete," which means "get in." She looked up and saw two men in plain clothes and a man in an orange prison uniform approaching the parking lot. The three men drove away in a black, mid-sized car, heading for Highway 281.

Hernandez testified on behalf of the government at trial. He explained that he had previously pled guilty to assisting the escape of Valladares, and carrying a weapon, and that he was testifying in order to ameliorate the recommendation for his sentencing. Hernandez identified himself as the person who entered the meeting room and led Valladares out of the jail. He stated that he pointed the gun at Deputy Alvarez, but that it was not loaded, although Valladares, Jr. had given him bullets for the gun. He also testified that the man who released the tear gas was called La Zota. After the escape, Hernandez, La Zota and a third man drove Valladares to the Texas–Mexico border, where Pedro Garcia picked him up on a motorcycle. Hernandez met with Valladares and Valladares, Jr. about 15 days later, but did not get paid the remainder of his fee for assisting the escape.

Hernandez testified extensively as to the planning stages of the escape. He stated that in March 1993, Jaime Ruiz introduced him to Valladares, Jr., who wished to hire some people to perform an unidentified job. Hernandez, Ruiz, and Valladares, Jr. first met at a hotel in Reynosa; Luis Valladares, Pedro Sosa, Manuel Alvarez, Maria Del Carmen, and Cesar Hernandez were also present at this meeting. Valladares, Jr. offered those present $40,000 each to assist in getting Valladares out of jail. Manuel Alvarez drove them to the Hidalgo County Jail on that day, but they did not go inside. The next day, the group met Salazar at his automobile accessory business, and Salazar drove Hernandez and two others to the Hidalgo County Jail, and took them inside to show them the floor plan of the jail. Salazar asked the men if they understood how the sliding glass door to the attorney/prisoner meeting

room worked and told them that a guard had already agreed to open the door.

The men hired to perform the escape stayed in a hotel in Reynosa for four weeks. They met several (ten to fifteen) times to discuss plans for the escape, either at the hotel or at Salazar's business. Salazar and Valladares, Jr. instructed the other men how to carry out the escape. The plan was to free Valladares during a contact visit in the attorney/prisoner meeting room, set off tear gas in the jail to prevent a chase, and drive Valladares to Mexico, changing cars two or three times along the way. Hernandez testified that Salazar gave him blueprints indicating the layout of the jail, and that Salazar purchased the tear gas cans which were used in the escape and gave them to Valladares, Jr.

Hernandez testified that, in Salazar's presence, Valladares, Jr. talked about using weapons in the escape. The participants in the escape obtained a .38 calibre handgun, a Colt .45, and two machine guns. The evidence does not indicate whether Salazar personally participated in obtaining any of the firearms. Hernandez first saw the weapons at a shop, which Hernandez believed to be managed by Salazar and connected to Salazar's business. He testified that Salazar saw the weapons on many occasions at the shop, and that he warned Hernandez and the others to be careful with the guns. The group made several unsuccessful attempts to free Valladares before April 18. On at least one occasion, Hernandez went to Salazar's shop and Salazar told him that everything was set for him to visit Valladares. Hernandez then went to the jail and visited with Valladares in the attorney/prisoner meeting room.

On April 18, 1993, the persons involved in the escape met at the shop, including Salazar. Salazar sent for a locksmith because the keys to the car containing the tear gas, the gun and clothes for Valladares were locked inside the shop. The locksmith opened the shop, then the group waited until one of their members, Manuel Alvarez, notified them that Ibanez was on his way to the jail to visit Valladares. Valladares, Jr. told Hernandez that he and Salazar had asked Ibanez to go to the jail to visit Valladares.

Hernandez, La Zota, and their unnamed driver got lost on the way to the jail, but Salazar and Valladares, Jr. led them there in another car. After the escape, Hernandez met with Salazar one time in McAllen, Texas, to get some things for the Valladareses out of the shop. Salazar told Hernandez at that meeting that the escape had come out fine, but that he was going to stay in Reynosa because he was in danger.

Ernest Baca, Criminal Investigator with the United States Marshal Service, testified as to his investigation of the escape. On April 19, 1993, he executed a federal warrant to search Valladares's home in Mission, Texas, where he seized a hand-drawn map of Hidalgo County Jail with "Operation Mongoose" scribbled on it, and a letter addressed to "Juan Antonio" (Salazar) instructing him to pay $1500 to two men identified as "Mr. Salinas," and "Edelmiro Flores," a guard at the jail. These two items were admitted into evidence.

Upon learning that Salazar was the occupant and caretaker of Valladares's house, Baca interviewed Salazar at his business "Suburban Auto Accessories," on April 20. Baca testified that Salazar's business also operated a shop, where the work which was ordered at "Suburban Auto Accessories" was performed. Salazar waived his *Miranda* rights and gave a written statement denying he had received any letter from Valladares. The next day, Salazar, accompanied by his attorney, gave another written statement to Baca retracting the first statement. Salazar's second statement admitted that Valladares had written him a letter instructing him to give cash to certain persons at Hidalgo County Jail. Salazar said he had accompanied Valladares, Jr. to the jail and had given a guard an envelope containing money. He attempted at another time to pay Mr. Salinas, the chief jailer, a "campaign contribution," but Mr. Salinas would not accept. Later, however, Salazar left the money on Salinas's desk at Valladares's further instruction. Valladares, Jr. provided the money for both payments. Salazar also stated that on the day of the escape, he and Valladares, Jr. went to Ibanez house and left word with Ibanez's son. They then went to the jail to

see Valladares, but did not wait for him to be brought to the front. Instead, they returned to Ibanez's house, where Valladares, Jr. and Ibanez spoke in private while Salazar waited in the car. Salazar stated that he went straight home from Ibanez's house, and cut off communication with Valladares, Jr. two days later. Both written statements made by Salazar were admitted into evidence.

## II. STANDARD OF REVIEW

■ The scope of our review of the sufficiency of the evidence after conviction by a jury is narrow. We must affirm if a reasonable trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Harris,* 25 F.3d 1275, 1279 (5th Cir.) *cert. denied,* — U.S. —, 115 S.Ct. 458, 130 L.Ed.2d 366 (1994); *United States v. Mergerson,* 4 F.3d 337, 341 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1310, 127 L.Ed.2d 660 (1994). We must consider the evidence, all reasonable inferences drawn therefrom, and all credibility determinations, in the light most favorable to the verdict. *United States v. Resio–Trejo,* 45 F.3d 907, 911 (5th Cir.1995); *United States v. Pigrum,* 922 F.2d 249, 253 (5th Cir.), *cert. denied,* 500 U.S. 936, 111 S.Ct. 2064, 114 L.Ed.2d 468 (1991). The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence. *Pigrum,* 922 F.2d at 254. On the other hand, if the evidence, viewed in the light most favorable to the verdict, gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, we must reverse the conviction. *United States v. Sanchez,* 961 F.2d 1169, 1173 (5th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 330, 121 L.Ed.2d 248 (1992).

## III. DISCUSSION

Salazar challenges his conviction on count three (aiding and abetting the knowing use of a firearm during a crime of violence in violation of 18 U.S.C. §§ 924(c)(1) and (2) on the basis that the Government failed to present sufficient evidence of the offense. Specifically, Salazar contends that the Government did not prove that Salazar aided and abetted Hernandez's use of a firearm during the escape because it did not present evidence that Salazar "associated" with Hernandez's use of a firearm or that he took affirmative action designed to aid the use of a firearm.

■ To establish an offense under § 924(c)(1), the Government must prove: (1) that the defendant knowingly used or carried a firearm, and (2) that the use or carrying of the firearm occurred during and in relation to a crime of violence. *United States v. Laury,* 49 F.3d 145, 151 (5th Cir.1995), *petition for cert. filed,* (U.S. June 21, 1995) (No. 94–9810). Salazar does not contest that assisting the escape of a federal prisoner in violation of 18 U.S.C. § 752(a) is a crime of violence under § 924(c). To prove the use or carrying of a firearm, the government need not show that the defendant used or brandished the weapon in an affirmative manner; it is sufficient for the government to prove that the "firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others." *United States v. Contreras,* 950 F.2d 232, 241 (5th Cir.1991), *cert. denied,* 504 U.S. 941, 112 S.Ct. 2276, 119 L.Ed.2d 202 (1992). Deputy Alvarez and Hernandez testified that Hernandez pointed a black gun at Alvarez to enable Hernandez and Valladares to exit the building without Alvarez giving chase. Although Hernandez testified that the gun was not loaded, "[t]he fact that a weapon is 'unloaded' or 'inoperable' does not insulate the defendant from the reach of section 924(c)(1)." *Contreras,* 950 F.2d at 241. Therefore, the Government presented sufficient evidence by which the jury could find that Hernandez knowingly used or carried a firearm during and in relation to a crime of violence. To convict Salazar, the government must have further presented evidence that Salazar aided and abetted Hernandez's use of a firearm in the course of the escape.

A person who aids or abets the commission of a crime is punishable as a principal. 18 U.S.C. § 2. To prove aiding and abetting, the Government must show that Salazar (1) associated with the criminal venture; (2) participated in the venture; and (3) sought by action to make the venture succeed. *Laury*, 49 F.3d at 151; *Harris*, 25 F.3d at 1279. Association means that the defendant shared in the criminal intent of the principal. *United States v. Martiarena*, 955 F.2d 363, 366 (5th Cir.1992). Participation means that the defendant engaged in some affirmative conduct designed to aid the venture. *Id.* at 366–67. Although relevant, mere presence and association are insufficient to sustain a conviction of aiding and abetting. *Id.* at 367.

This circuit has not considered aider and abettor liability under § 924(c)(1) when the defendant was not present during the commission of the crime in which the firearm was used. However, this court has considered aider and abettor liability in the context of a § 924(c) violation. *See Laury*, 49 F.3d at 151; *Harris*, 25 F.3d at 1279; *United States v. Williams*, 985 F.2d 749, 754 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993). This court has never imposed a requirement that an individual be physically present when the gun is used to be convicted of aiding and abetting under § 924(c)(1). To convict Salazar for aiding and abetting Hernandez's use of a firearm during the escape, the jury was required to find that Salazar knew that the gun was at least available to Hernandez, *see Williams*, 985 F.2d at 755, and that Salazar took some action which assisted Hernandez's use of the gun. *See Martiarena*, 955 F.2d at 366–67.

Hernandez testified that Salazar was involved in the planning of the escape, but that he was not present during the actual escape. Hernandez's testimony was sufficient to demonstrate that Salazar knew that a weapon was available to Hernandez and that Salazar took affirmative action to aid in the use of the weapon during the escape. Hernandez testified that Salazar was present when Valladares, Jr. discussed using weapons with the group. Hernandez saw the firearms, including the black handgun which was actually used, being stored at Salazar's business. Hernandez testified that, during a meeting at Salazar's shop when the guns were present, Salazar warned Hernandez to be careful with the weapons. From this statement, the jury could have reasonably inferred that Salazar knew that using a weapon was part of the escape plan and that Hernandez would carry a gun during the escape. The jury could also have considered the evidence that the weapons were stored at Salazar's place of business as an affirmative act aiding the use of the weapon. Salazar also assisted Hernandez by getting a locksmith to unlock his shop in which the keys to the car that contained the gun and was used in the escape were located. Therefore, the Government presented sufficient evidence by which the jury could find that Salazar aided and abetted Hernandez's use of a firearm during the escape.

## IV. CONCLUSION

Because the evidence was sufficient to convict Salazar for aiding and abetting the use of a firearm during a crime of violence under §§ 924(c)(1) and 2, we AFFIRM his conviction and sentence.