# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-10425

United States Court of Appeals
Fifth Circuit

**FILED**

May 2, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

HUGH WILLETT

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before SMITH, DeMOSS, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

Defendant-Appellant Hugh Willett ("Willett") was charged with one count of conspiracy to commit health-care fraud, in violation of 18 U.S.C. § 1349, and six counts of aiding and abetting health-care fraud, in violation of 18 U.S.C. §1347 and 18 U.S.C. § 2. After a bench trial, the district court found Willett guilty on all seven counts and sentenced him to a 41-month term of imprisonment, the bottom of the applicable guidelines range. For the reasons that follow, we AFFIRM.

I.

JS&H Orthopedic ("JS&H") was a durable medical equipment ("DME") supplier. DME suppliers provide items to patients with prescriptions and then submit claims to Medicare and private insurance companies, which reimburse

the suppliers directly for the items they provided based on the billing codes (called HSPCS codes) that the suppliers included in their claims. The Medicare provider application for JS&H listed Willett's wife, Jean Willett ("Mrs. Willett"), as the owner of JS&H. However, JS&H stood for "Jean, Stuart, and Hugh" (as in Hugh Willett), and people perceived Willett as a co-owner or principal of JS&H because Willett represented himself as such. JS&H had fewer than ten employees, including Ryan Canady ("Canady"), Willett's grandnephew, who worked in billing and deliveries; and Robin Canady ("Mrs. Canady"), Canady's mother and Willett's niece, who worked in billing.

JS&H purchased another company, Texas Orthotic and Prosthetic Systems ("TOPS"), of which Willett certified he was a five-percent-or-greater owner. The employees were told that both Willett and Mrs. Willett owned TOPS. JS&H submitted claims to Aetna through TOPS because JS&H was not in Aetna's network. The Medicare provider application for TOPS listed Willett as the owner, and he signed the application, which stated: "My signature legally and financially binds this supplier to the laws, regulations, and program instructions of the Medicare program."

In February 2011, a federal grand jury indicted Willett and Mrs. Willett with one count of conspiracy to commit health-care fraud, in violation of 18 U.S.C. § 1349, and five counts of aiding and abetting health-care fraud, in violation of 18 U.S.C. § 1347 and 18 U.S.C. § 2. Mrs. Willett pleaded guilty to the charges against her. In June 2012, a second superseding indictment charged Willett with one count of conspiracy to commit health-care fraud, in violation of 18 U.S.C. § 1349, and six counts of aiding and abetting health-care

fraud, in violation of 18 U.S.C. §1347 and 18 U.S.C. § 2. Willett pleaded not guilty, and the parties later agreed to a bench trial.

At trial, the government alleged that JS&H "upcoded" and billed for three more expensive items of DME that it did not in fact provide. First, JS&H coded hip abduction pillows—for which Medicare would have provided no payment, and for which private insurers would have paid about $40—as hip orthotics (or braces), for which Medicare and private insurers paid about $770. Second, JS&H coded walking boots—for which Medicare and private insurers would have paid about $150—as tibia fracture braces, for which Medicare and private insurers paid about $500. Third, JS&H coded basic wrist braces—for which Medicare and private insurers would have paid about $50—as complex wrist braces, for which Medicare and private insurers paid about $170. Furthermore, the government alleged that TOPS submitted claims to Aetna for the upcoded tibia fracture braces and complex wrist braces, which neither JS&H nor TOPS had in fact provided. Finally, the government alleged that JS&H employees, in a practice directed by Mrs. Willett, signed physician names, without permission, on letters of medical necessity ("LMNs") that JS&H and TOPS submitted to private insurers and prepared the LMNs so that they also reflected the fraudulent codes.

After a four-day bench trial, the district court found Willett guilty on all seven counts. Willett filed a post-verdict motion for judgment of acquittal and for a new trial, arguing that the verdict rested on "inference upon inference"—particularly with respect to the marriage relationship—to find the requisite level of knowledge for conviction. Willett also asked the district court to reconsider its decision to exclude certain polygraph evidence and to grant a

No. 13-10425

new trial to consider the portion of the polygraph evidence that allegedly would counter one key witness's testimony. The district court denied the motion.

The presentence investigation report ("PSR") recommended a guidelines range of 41 to 51 months, which included a two-level sentence enhancement under U.S.S.G. § 3B1.3 for abuse of trust based on Willett's position as co-owner of a DME distributor, his responsibility to submit legitimate and genuine claims to Medicare, and his use of that position to silence an employee who confronted him about billing discrepancies. Willett objected to application of the enhancement. The district court overruled the objection and sentenced Willett to an imprisonment term of 41 months, the bottom of the guidelines range. Willett timely filed a notice of appeal from the judgment of conviction and sentence.

## II.

Willett argues first that the evidence was insufficient to prove that he had the requisite knowledge—specifically, that he knew about Mrs. Willett's fraudulent coding—to sustain his convictions. "When a defendant challenges a bench-trial conviction on sufficiency-of-the-evidence grounds we focus on whether the finding of guilt is supported by substantial evidence, i.e., evidence sufficient to justify the trial judge, as the trier of fact, in concluding beyond a reasonable doubt that the defendant is guilty." *United States v. Tovar*, 719 F.3d 376, 388 (5th Cir.), *cert. denied*, 134 S. Ct. 461 (2013) (internal quotation marks and citation omitted). "We view all evidence in the light most favorable to the government and defer to reasonable inferences drawn by the trial court." *United States v. Esparza*, 678 F.3d 389, 392 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1455 (2013).

4

No. 13-10425

To prove a conspiracy to commit health-care fraud in violation of 18 U.S.C. § 1349, "the government must prove beyond a reasonable doubt that (1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *United States v. Grant,* 683 F.3d 639, 643 (5th Cir. 2012) (citing 18 U.S.C. §§ 1347, 1349; *United States v. Delgado* 668 F.3d 219, 226 (5th Cir. 2012)). "Direct evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence." *Delgado*, 668 F.3d at 226 (citing *United States v. Garza-Robles*, 627 F.3d 161, 168 (5th Cir. 2010)). "The conspirators may have a silent and informal agreement. Indeed, the voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014). "However, there is insufficient evidence of a conspiracy if the Government has only piled inference upon inference upon which to base a conspiracy charge." *Id.* (internal quotation marks and citation omitted); *see also United States v. Mackay*, 33 F.3d 489, 493 (5th Cir. 1994).

To prove health-care fraud in violation of 18 U.S.C. § 1347, the government must prove beyond a reasonable doubt that the defendant "knowingly and willfully execute[d], or attempt[ed] to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services." *Imo*, 739 F.3d at 235-36 (quoting 18 U.S.C. § 1347); *see also United States v. Girod*, 646 F.3d 304, 313 (5th Cir. 2011).

5

No. 13-10425

Both charges require proof of knowledge and specific intent to defraud. *See, e.g.*, *United States v. Brooks*, 681 F.3d 678, 699 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 836, 133 S. Ct. 837, *and* 133 S. Ct. 839 (2013); *Delgado*, 668 F.3d at 225-26; *Girod*, 646 F.3d at 314; *United States v. Garcia*, 432 F. App'x 318, 326 (5th Cir. 2011) (unpublished) (citing *United States v. Hickman*, 331 F.3d 439, 443-45 (5th Cir. 2003)). However, this proof may be inferred from circumstantial evidence. *See, e.g.*, *Delgado*, 668 F.3d at 226; *United States v. Whitfield*, 485 F. App'x 667, 670 (5th Cir. 2012) (unpublished) (citing *United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996)); *Grant*, 683 F.3d at 643. Furthermore, "[a] defendant need not have actually submitted the fraudulent documentation . . . in order to be guilty of health care fraud or conspiracy to commit health care fraud." *Imo*, 739 F.3d at 235.

For the reasons elaborated below, the evidence was sufficient to justify the district court in concluding that Willett knew about the fraudulent upcoding and that the government proved Willett's guilt beyond a reasonable doubt.

First, the district court could infer that Willett knew about the upcoding because of his proximity to the fraudulent activities. Willett was responsible for making deliveries of DME to the hospitals and picking up the delivery tickets, which were forms that showed which products the patients had received from the hospitals. Willett would then deliver these tickets to Mrs. Willett, who would either change the existing codes on the tickets by ripping off or whiting out the stickers, or write in the codes where there were no existing codes. There was evidence that Willett often was present in Mrs. Willett's office and at the front desk when she ripped off or doctored the codes on the delivery tickets.

Additionally, Willett and Mrs. Willett met several times a day to discuss the business and review the reimbursement checks together. One employee

heard the couple discussing the hip abduction pillow and how well it paid, after which Willett left Mrs. Willett's office and said "I almost feel guilty about that" and then laughed and said "no, I don't." The employee testified that she remembered this conversation because the tone of Willett's voice "sounded bad . . . like something was being done and he was being kind of cocky about it." *See United States v. Brown*, 354 F. App'x 216, 221-22 (5th Cir. 2009) (unpublished) (finding evidence sufficient for fraud and conspiracy where defendant knew that DME suppliers were paying kickbacks to clinic because defendant was present for many of the fraudulent transactions).

Although, as the district court acknowledged, a 35-year marriage alone is not enough to impute intent because "intent may not be proven solely by a family relationship," *United States v. Soape*, 169 F.3d 257, 264 (5th Cir. 1999), "when inferences drawn from the existence of a family relationship or mere knowing presence are combined with other circumstantial evidence, there may be sufficient evidence to support a conspiracy conviction." *Id.* Willett and Mrs. Willett were signatories to the business accounts of both companies and to joint personal bank accounts. There also was evidence that Willett benefited from the fraud as the joint holder of the personal and business accounts. *See id.* at 265 (finding evidence sufficient to prove conspiracy where co-conspirator added herself to joint account, used account credit card to make purchases, and endorsed account check with suspicious address).

Second, the district court could infer that Willett knew about the upcoding because he held himself out as an owner of and had a position of authority in JS&H and TOPS. *See United States v. Vernon*, 723 F.3d 1234, 1274 (11th Cir. 2013) (finding evidence sufficient for conspiracy where husband was present for discussion of fraud, was involved in wife's business, and described himself as "president" of business). There was also evidence that Willett distributed paychecks to employees and dealt with JS&H's certified

public accountant. *See United States v. Davis*, 490 F.3d 541, 549-50 (6th Cir. 2007) (finding evidence sufficient for fraud where, even though defendant's wife spearheaded fraudulent activities, defendant wrote checks for the corporation, hired and fired employees, and was frequently present while fraudulent activities occurred at the office).

Willett contends that he was not the legal owner of TOPS. However, Willett signed the Medicare provider application for TOPS as a five-percent-or-greater owner of the company and certified that his signature bound TOPS truthfully to comply with the Medicare rules. *See United States v. Read*, 710 F.3d 219, 226 (5th Cir. 2012) (finding evidence sufficient for conspiracy and fraud where husband and wife were owners of ambulance business, made business decisions, and were aware of regulations governing reimbursement), *cert. denied*, 133 S. Ct. 2796 (2013).

Furthermore, Mrs. Willett instructed the employees to forge physician signatures and to use the codes that Mrs. Willett had written on the reimbursement forms when filling out the LMNs to bill private insurance companies. The billing codes and LMNs were fraudulently altered in the same way for claims submitted through TOPS as they were for claims submitted through JS&H. Mrs. Canady questioned the legitimacy of the LMNs and, at one point, Willett told Mrs. Canady that there was nothing wrong with the way JS&H handled the LMNs and that JS&H would not change the forms. *See United States v. Crawley*, 381 F. App'x 462, 465 (5th Cir. 2010) (unpublished) (finding evidence sufficient for conspiracy and fraud where defendant continued to advocate the use of company's Medicare billing practices even after learning that the practices were improper).

Third, the district court could infer that Willett knew about the upcoding because his duties made him aware of the high profit margins that JS&H was receiving on the three upcoded items—the hip abduction pillow, the walking

No. 13-10425

boot, and the simple wrist brace. Willett was responsible for ordering and negotiating prices for the items. Although other employees sometimes ordered products, Willett placed at least some orders for the walking boots and was aware of how much JS&H paid for them. Willett also negotiated bulk preferred pricing for the basic wrist braces. Willett instructed Canady how to order the hip abduction pillows.

As noted above, Willett was responsible for making deliveries of DME to the hospitals, picking up the delivery tickets, and delivering them to Mrs. Willett, who would rip off or doctor the existing codes. The employees then billed the product codes that Mrs. Willett had written on the replacement stickers, rather than the product codes that would have been on the original stickers. *See Grant*, 683 F.3d at 645-46 (finding sufficient evidence for conspiracy where defendant made deliveries of DME ordered through forged prescriptions and where fraud would not have been possible without defendant's deliveries).

Willett also was responsible for depositing the reimbursement checks to the bank and dealing with the company's accountant. After JS&H received the checks from the insurance companies, Willett and Mrs. Willett would go through the checks together. Thus, Willett's duties put him in a position to know what the company paid for the items and what it was reimbursed for the items. JS&H paid about $25 to purchase a hip abduction pillow but was reimbursed about $770. JS&H paid about $37 for a walking boot but was reimbursed about $555. JS&H paid about $10 for each simple wrist brace but was reimbursed about $170. The average profit margins on the three items were 3,194%, 1,500%, and 1,607%, respectively. *See Davis*, 490 F.3d at 549 (explaining that circumstantial evidence of fraudulent intent can include profits); *United States v. Pettigrew*, 77 F.3d 1500, 1519-20 (5th Cir. 1996)

9

(finding evidence sufficient for conspiracy where defendant was aware of excess profits and company's efforts to disguise excess profits).

Willett argues that Kristy Keenan, the office manager, was closer to Mrs. Willett and oversaw more business than did Willett. However, one witness testified that, prior to finalizing an order, Keenan would wait for Willett to make a decision. Furthermore, the fact that another employee also had supervisory authority does not negate the inference that can be drawn from Willett's role in the business. Without Willett ordering the products, delivering them to the hospitals, picking up the delivery tickets, and bringing them to Mrs. Willett to alter, the fraud could not have occurred. *See United States v. Mauskar*, 557 F.3d 219, 230 (5th Cir. 2009) (finding evidence sufficient for conspiracy where physician signed certificates of medical necessity that DME companies then altered because the alteration did not diminish physician's responsibility for signatures, without which "the government would not have suffered the losses it did").

Finally, the district court heard testimony by Canady, whom it found to be a highly credible witness, from which it could infer that Willett knew about the upcoding. Canady noticed "lopsided" codes and through internet research discovered that the code that JS&H had been using for the hip abduction pillow matched what looked like a more complicated brace—a product that JS&H had never delivered to its customers. Canady discussed this first with Mrs. Willett, who said that they were using the correct codes, that she had "been through this a year ago," and that if Canady thought they were using the incorrect codes he should "prove it."

The next day, Canady raised his concerns with Willett, whom Canady perceived as a co-owner of JS&H. Willett became "tense," and Canady testified: "He told me if I liked my job with JS&H that I shouldn't bring up the conversation of the hip pillows again. And he also said if I don't like the way

they do their billing, then I should go find a job somewhere else." Canady also testified that Willett did not seem surprised by the information but rather seemed "ready for it." That same day, Canady explained to Mrs. Willett that there was a Medicare hotline they could call to determine if they were billing the correct codes. Mrs. Willett became angry and fired both Canady and Mrs. Canady. Thereafter, Willett continued to make deliveries of DME. After receiving one large shipment of hip abduction pillows, Willett told two employees: "[T]his is our biggest seller. You gals need to really push this item." Before Canady's firing, JS&H billed the pillow 18 times; after Canady's firing, JS&H billed the pillow 72 times. *See Read*, 710 F.3d at 226 (finding evidence sufficient for conspiracy and fraud where defendants knew about reimbursement regulations and were informed several times that they were overutilizing reimbursement but continued the practice anyway); *see also United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011); *United States v. Dearing*, 504 F.3d 897, 901 (9th Cir. 2007).

We hold that the evidence was sufficient to sustain Willett's convictions.

### III.

Willett argues second that the district court committed reversible error in excluding, under Federal Rule of Evidence 403, expert testimony as to the results of a polygraph examination that Willett took. "We review evidentiary rulings for abuse of discretion, subject to harmless error analysis." *Brooks*, 681 F.3d at 709.

Willett had written an exculpatory statement prepared for his defense counsel explaining that the reason he told Canady to be careful in discussing the coding with Mrs. Willett was that Willett feared that Canady could lose his job. In turn, defense counsel received from Willett's polygraph examiner the determination that Willett truthfully answered "no" when asked if he had lied or intentionally misrepresented information in that exculpatory statement

prepared for counsel. Willett proffered as evidence the testimony of the expert examiner as to the results of that examination. The district court conducted a *Daubert* hearing and concluded that the science behind polygraph evidence was sound and that the expert was a highly credible witness. The district court nevertheless excluded the evidence because it was not "helpful under a Rule 403 analysis or more probative than prejudicial." Willett argues that the district court erred in excluding the polygraph evidence under Rule 403 because the risk of prejudice is minimal in a bench trial.

Even assuming *arguendo* that the district court erred to the extent that it excluded the polygraph evidence in a bench trial based on perceived "prejudice" as distinct from unhelpfulness caused by, for example, undue delay, *see Gulf States Utilities Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981), we "will not vacate a conviction based on an error committed by the district court unless the error was harmful, affecting a substantial right of the complaining party. When assessing whether an error affected a substantial right of a defendant, the necessary inquiry is whether the trier of fact would have found the defendant guilty beyond a reasonable doubt with the additional evidence inserted." *United States v. Wen Chyu Liu*, 716 F.3d 159, 169 (5th Cir. 2013) (internal quotation marks and citations omitted), *cert. denied*, 134 S. Ct. 1011 (2014). "A trial judge sitting without a jury is entitled to greater latitude in the admission or exclusion of evidence." *So. Pac. Transp. Co. v. Chabert*, 973 F.2d 441, 448 (5th Cir. 1992). The government has the burden of showing that the error was harmless. *Liu*, 716 F.3d at 169.

Willett argues that "the evidence should have been admitted for the narrow purpose of better evaluating Ryan Canady's impressions of his uncle's reaction." For that proffered purpose, the district court's exclusion of the polygraph evidence was harmless. The district court reiterated several times that it credited Canady's testimony and questioned the helpfulness of the

polygraph evidence. Furthermore, viewed in light of all of the evidence that the district court heard and cited in making its decision, any effect of excluding Willett's alternative characterization of one part of one witness's testimony was minimal. The district court heard evidence that Willett was an owner of TOPS; held himself out as an owner of JS&H; was present when Mrs. Willett fraudulently upcoded the claims; knew how much the companies were reimbursed compared to how much the companies paid for the DME items and "almost fe[lt] guilty" about it; encouraged employees, after Canady's firing, to "push" the hip abduction pillow because it was the "biggest seller"; and at least failed to respond to or investigate Canady's concerns about the billing. The district court credited the government's witnesses, cited much of the above evidence in making its findings, and stated that it was "in no way an exhaustive review" of why the evidence was sufficient to convict. *See United States v. Isiwele*, 635 F.3d 196, 201-202 (5th Cir. 2011) (holding that district court's exclusion of documents was an abuse of discretion but harmless because the defendant offered the documents only to impeach, and other circumstantial evidence, including testimony of credible witnesses, established that the defendant had filed fraudulent claims for DME reimbursement).

Therefore, even assuming that the district court erred in a bench trial in excluding this polygraph evidence, we hold that any error was harmless.

IV.

Willett argues third that the district court erred in imposing an abuse-of-trust sentencing enhancement under U.S.S.G. § 3B1.3 based on Willett's use of his position in the companies to facilitate the offenses. "This court reviews de novo the district court's guidelines interpretations and reviews for clear error the district court's findings of fact." *United States v. Miller*, 607 F.3d 144, 147 (2010) (internal quotation marks and citation omitted). "A district court's application of section 3B1.3 is a sophisticated factual determination that an

appellate court reviews for clear error." *United States v. Pruett*, 681 F.3d 232, 248 (5th Cir. 2012) (internal quotation marks and citation omitted).

Section 3B1.3 of the sentencing guidelines provides: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." U.S.S.G. § 3B1.3. We apply a two-part test to determine whether there has been an abuse of trust for purposes of the § 3B1.3 enhancement: "(1) whether the defendant occupies a position of trust and (2) whether the defendant abused her position in a manner that significantly facilitated the commission or concealment of the offense." *Miller*, 607 F.3d at 148 (internal quotation marks and citation omitted).

The PSR recommended the § 3B1.3 two-level enhancement based on Willett's position as a co-owner of a DME distributor and his responsibility to submit legitimate and genuine claims to Medicare. Willett objected to the enhancement. At sentencing, Willett acknowledged that he probably occupied a position of trust for purposes of *Miller* part one but argued that there was not enough evidence to establish that he abused that position in a manner that significantly facilitated the commission or concealment of the offense for purposes of *Miller* part two. The district court applied *Miller* and overruled Willett's objection, finding that there was credible circumstantial evidence that Willett was a co-owner of and had a position of authority in the companies and that he used that position to facilitate the commission or concealment of the offense, particularly when Willett told Canady, who spoke to Willett because he considered him a supervisor, to "keep [his] mouth shut."

In determining whether a defendant occupies a position of trust for purposes of *Miller* part one, we look to his ability to exercise professional or managerial discretion. *See Miller*, 607 F.3d at 148. We have held that a DME provider occupies a position of trust because, in order to provide

14

reimbursements, Medicare relies on the honesty and forthrightness of DME providers in their claim submissions. *See id.* at 150; *see also Isiwele*, 635 F.3d at 205 (affirming enhancement because defendant's status as DME supplier placed him in relationship of trust with Medicare); *United States v. Hawkins*, 378 F. App'x 402, 403 (5th Cir. 2010) (unpublished) (affirming enhancement where defendant DME provider exercised managerial discretion, gave patient information to an employee to record on preauthorized certificates of medical necessity, received medical equipment, tracked patients and referrals, and paid invoices).

The district court heard evidence that Willett was in a position of authority and held himself out as an owner of JS&H. *See* U.S.S.G. § 3B1.3 cmt. 3 ("This enhancement also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not."). There was also evidence that Willett exercised authority in placing orders for equipment; delivering equipment to the hospitals and offices; picking up the delivery tickets for billing purposes; and making deposits to the bank. Furthermore, Willett signed the Medicare provider application for TOPS, in which he indicated that he was an owner of TOPS and certified that his signature bound TOPS to comply with the requirements of Medicare. Thus, Willett occupied a position of trust for purposes of the enhancement.

In determining whether a defendant abused his position in a manner that significantly facilitated the commission or concealment of the offense for purposes of *Miller* part two, we look to whether a defendant occupies "a superior position, relative to all people in a position to commit the offense, as a result of [his] job." *Miller*, 607 F.3d at 150 (citing *United States v. Kay*, 513 F.3d 432, 459 (5th Cir. 2007)). We have held that ownership of a DME provider places the owner in a position to defraud government insurance programs with

ease. *See Miller*, 607 F.3d at 150; *see also United States v. St. Junius*, 739 F.3d 193, 209 (5th Cir. 2013) (holding that owner of DME provider significantly facilitated fraud where she signed documents as owner, issued paychecks to employees and contractors, and engaged in other activities without which "it would have been extraordinarily difficult" for the provider "to accomplish its criminal pursuits"); *United States v. Njoku*, 737 F.3d 55, 78 (5th Cir. 2013) (holding that registered nurse significantly facilitated conspiracy where she had some supervisory power over other employees and filled out forms on which Medicare relied).

The district court heard evidence that Willett was present in Mrs. Willett's office while she altered the codes; met with Mrs. Willett several times a day to discuss the business and review the checks; deposited the reimbursement checks to the bank; and distributed paychecks to employees. Canady testified that he heard Willett and Mrs. Willett discuss the possibility of shredding TOPS paperwork. Furthermore, Willett told employees that there was nothing wrong with the way they handled the LMNs, that they would not change their methods, and that they should "push" the hip abduction pillow because it was the "biggest seller." Finally, Canady discussed his concerns with Willett because Canady perceived Willett to be a co-owner of JS&H, and Willett responded that Canady should not raise the issue again if he liked his job. Thus, Willett used his position of trust in a way that significantly facilitated the commission or concealment of the offenses.

We therefore hold that the district court did not err in applying the abuse-of-trust enhancement under § 3B1.3.

The judgment is AFFIRMED.

16