# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-50512

United States Court of Appeals
Fifth Circuit

**FILED**
January 3, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

KATHLEEN MARINA KELLY-TUORILA,

Defendant–Appellant.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:16-CR-39-2

Before STEWART, Chief Judge, and KING and OWEN, Circuit Judges.

PER CURIAM:*

Kathleen Marina Kelly-Tuorila was indicted on one count of conspiracy to commit health care fraud, one count of aiding and abetting health care fraud, eleven counts of aiding and abetting aggravated identity theft, and eight counts of aiding and abetting in making false statements related to healthcare. A jury convicted her on all twenty-one counts, and she appeals the sufficiency of the evidence as to each. We affirm the district court's judgment.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-50512

**I**

Daniel Smith owned DTS Medical Supply Company (DTS), a provider of durable medical equipment (DME), such as power scooters and wheelchairs. Kathleen Marina Kelly-Tuorila was the office manager and operations manager of DTS. She performed the billing and coding requirements to file claims with Medicare and Medicaid. Robin Haigler, another DTS employee, recruited and solicited individuals to be recipients of equipment that DTS provided.

In 2009, Haigler approached Michelle Cleavelin and her husband, Keith Cleavelin, while at a sports bar. Haigler told Mr. Cleavelin that he could obtain a power wheelchair from DTS at no cost if he provided his Medicare number. As a previous billing manager for a DME provider, Mrs. Cleavelin knew Haigler's offer was inappropriate. Her suspicions aroused, Mrs. Cleavelin gave Haigler Mr. Cleavelin's Medicare number. In October 2009, DTS delivered a power wheelchair to the Cleavelins' house. Mrs. Cleavelin filed a complaint with Health Integrity, a government contractor that investigates fraud. Health Integrity sent a letter to DTS asking it to provide documentation to support its claim. DTS did not comply with this request. The FBI also began investigating DTS.

Medicare regulations required DTS to have documents on file prior to submitting a claim for DME reimbursement, including: a physician's prescription; the prescribing physician's face-to-face evaluation of the patient; the delivery ticket, showing delivery and receipt of the DME to the beneficiary; documentation showing that a home was fit for the DME; and other additional progress notes on the beneficiary's status. However, DTS was not required to send the documentation to Medicare when it made a claim. DTS would submit claims on an HCFA-1500 form (1500 form). The 1500 form requires, in

relevant part, the name of the prescribing physician and the physician's National Provider Identifier (NPI) number, which is unique to every physician. The form requires a provider to include the code for the particular equipment delivered to the beneficiary. The 1500 form also includes a block for the provider to insert a modifier, which provides Medicare information about the claim. For example, the "KX" modifier indicates that the provider has all of the required documentation for a claim on file.

The Government's investigation revealed two fraudulent schemes. First, DTS used physicians' NPI numbers on claim forms even though the physicians did not prescribe a DME. Second, DTS billed Medicare and Medicaid for power wheelchairs but provided its customers with power scooters. Power wheelchairs provided DTS a larger reimbursement than power scooters. Based on the investigation, the Government indicted Smith, Haigler, and Kelly-Tuorila. The indictment alleged: (1) conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 (count one); (2) health care fraud in violation of 18 U.S.C. §§ 1347 & 2 (count two); (3) aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) & 2 (counts three through thirteen); and (4) false statements related to health care matters in violation of 18 U.S.C. §§ 1035 & 2 (counts fourteen through twenty-one). Haigler pleaded guilty. Smith and Kelly-Tuorila were tried before a jury. The jury found both defendants guilty on all counts. Kelly-Tuorila filed a motion for post-verdict acquittal, which the district court denied. She now appeals.

No. 17-50512

## II

When a defendant moves for acquittal in the district court, this court reviews challenges to the sufficiency of the evidence de novo.[1] "Appellate review is highly deferential to the jury's verdict,"[2] so the "jury's verdict will be affirmed unless no rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt."[3] The jury may make factually-based inferences,[4] but "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference."[5]

## III

To establish conspiracy to commit health care fraud, the Government must prove beyond a reasonable doubt "that (1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose."[6] "The agreement may be silent and informal,"[7] and "may be inferred from concert of action."[8] "The Government may establish any element through

---

[1] *United States v. Danhach*, 815 F.3d 228, 235 (5th Cir. 2016) (citing *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012)).

[2] *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018).

[3] *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (quoting *United States v. Roetcisoender*, 792 F.3d 547, 550 (5th Cir. 2015)).

[4] *Ganji*, 880 F.3d at 767.

[5] *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996).

[6] *Grant*, 683 F.3d at 643 (citing 18 U.S.C. §§ 1347, 1349; *United States v. Delgado*, 668 F.3d 219, 226 (5th Cir. 2012)).

[7] *United States v. Barson*, 845 F.3d 159, 163 (5th Cir. 2016) (citing *Grant*, 683 F.3d at 643).

[8] *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009) (quoting *United States v. Bieganowski*, 313 F.3d 264, 276 (5th Cir. 2002)).

circumstantial evidence,"[9] but "[p]roof of an agreement to enter a conspiracy is not to be lightly inferred."[10]  Proving that "the defendant knew something criminal was afoot" is insufficient evidence of conspiracy,[11] as is piling "inference upon inference."[12]  Also, "'[m]ere similarity of conduct among various persons and the fact that they have associated with or are related to each other' is insufficient to prove an agreement."[13]

Kelly-Tuorila argues that the Government did not present sufficient evidence that, through her actions, she entered into an unlawful agreement with Smith or Haigler.  She asserts that she trusted DTS's recruiters and accepted the documentation they provided to her.  She maintains that she treated all claims the same not knowing that some were illegitimate.  She also argues that she did not know of the unlawful purpose of any alleged conspiracy and she did not intend to further it.

The Government presented evidence from Kelly-Tuorila herself that she knew about DTS's fraudulent activity.  FBI Agent Robert Gutierrez was to have conducted a polygraph examination of Kelly-Tuorila on January 5, 2012.  But before he began the examination, Kelly-Tuorila informed him that "she submitted approximately 1,000 fraudulent claims knowingly to Medicare."  Because of her admission, Agent Gutierrez did not conduct the polygraph exam and took a written statement from Kelly-Tuorila.  The statement provided:

---

[9] *Ganji*, 880 F.3d at 767 (citing *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014)).

[10] *Id.* (alteration in original) (quoting *United States v. Johnson*, 439 F.2d 885, 888 (5th Cir. 1971)).

[11] *Id.* at 776 (citing *United States v. Alvarez*, 610 F.2d 1250, 1257 (5th Cir. 1980)).

[12] *United States v. Imo*, 739 F.3d 226, 235 (5th Cir. 2014) (quoting *Grant*, 683 F.3d at 642).

[13] *Ganji*, 880 F.3d at 767-68 (quoting *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978)).

No. 17-50512

1) I knew approximately 1000 claims submitted to be fraudulent.

2) I approximate those claims to be valued at $4,000,000.

3) Robin Haigler determined which patients received a scooter vs. motorized wheelchair.

4) It is my understanding that she (Robin Haigler) was fully aware that the claims being submitted were fraudulent.

5) I know that she was being paid cash via wire transfers.

6) I average a salary of $4,000 per month . . . .  Robin's salary averaged $8,000-10,000 due to being wired from DTS account to my personal account, to Robin's personal account.

7) I'm sorry that things progressed the way they did and that I was not more vigilant in bringing a stop to it.  The above statements were made by me.

Kelly-Tuorila argues that the written statement was made with the benefit of hindsight.  This contradicts Agent Gutierrez's testimony at trial.  Agent Gutierrez was specifically asked, "So she indicated to you that she knew at the time that she was submitting them that they were fraudulent?" and he responded, "That is correct."  Agent Gutierrez reiterated this point on cross-examination when asked why he never performed the polygraph exam.  He stated that she admitted the relevant issue which negated the need for the polygraph.  Viewing this evidence in the light most favorable to the prosecution, a rational jury could have determined that Kelly-Tuorila knew of the unlawful purpose of the conspiracy.

The written and oral confessions also support the jury's conclusion that Kelly-Tuorila was a part of the agreement and intended to further it.  They are evidence that Kelly-Tuorila submitted claims that she knew to be fraudulent.  It is reasonable for a jury to infer that Kelly-Tuorila intended to be a part of the agreement and to further it by knowingly submitting false claims.

No. 17-50512

The Government also presented circumstantial evidence that supports the conspiracy conviction. For example, a week after Kelly-Tuorila confessed to Agent Gutierrez, FBI Agent Lee McLoy asked Kelly-Tuorila to call Smith and record the conversation. During the call, Kelly-Tuorila indicated to Smith that she "had knowledge that DTS was billing for power wheelchairs to Medicare and Medicaid, though DTS was providing its customers scooters." She told him that the process needed to stop. According to Agent McLoy, the FBI did not know about that scheme (providing power scooters while billing for power wheelchairs) until this call. The FBI had been investigating only the fraudulent use of physicians' identifications to support unprescribed claims.

The evidence is unrefuted that Kelly-Tuorila ordered scooters from Heartway USA, a scooter provider, and she was responsible for submitting claims to Medicare and Medicaid for such medical devices. On several occasions, Kelly-Tuorila submitted claims to Medicare for power wheelchairs before she ordered power scooters from Heartway. Moreover, neither Kelly-Tuorila nor any other DTS employee submitted a single claim for a power scooter. Only claims for power wheelchairs were submitted. A rational jury could infer that when Kelly-Tuorila ordered a scooter, she knew that DTS had billed or intended to bill Medicare or Medicaid for a power chair.

Additionally, the Government presented evidence that Smith transferred reimbursement funds from Medicare and Medicaid to Kelly-Tuorila. Smith received $3,748,392.04 in payments from Medicare and Medicaid that went into DTS's business account. Smith transferred $163,050 from that account to Kelly-Tuorila over the course of eighteen months. Kelly-Tuorila then made wire transfers totaling over $30,000 to other DTS employees or their relatives. Kelly-Tuorila argues that she received a consistent salary, and that the Government failed to prove that the money

7

transferred to her account was not her salary. However, Kelly-Tuorila has no explanation for the transfers of more than $30,000 from her personal account to other DTS employees or their relatives.

Kelly-Tuorila relies upon *United States v. Ganji*, arguing that she did nothing that an innocent person would not do, and therefore that her conviction cannot stand. This case is unlike *Ganji*, in which witnesses who had admitted to fraudulent behavior testified that they did not know the defendant.[14] In the present case, there is evidence that Kelly-Tuorila knew that she was engaged in a fraudulent scheme, including her admissions that she submitted false claims.

Even if Kelly-Tuorila could offer an alternative explanation for all of the Government's evidence, we are tasked with viewing the evidence in the light most favorable to the prosecution.[15] Viewed in that light, the evidence is sufficient for a rational jury to determine that each element of the conspiracy was met beyond a reasonable doubt.

## IV

Kelly-Tuorila was convicted on other counts of aiding and abetting: (1) health care fraud; (2) aggravated identity theft; and (3) false statements related to health care. To obtain a conviction for aiding and abetting, "the Government must prove (1) that the defendant associated with the criminal venture, (2) participated in the venture, and (3) sought by action to make the venture succeed."[16] "Association means that the defendant shared in the

---

[14] *Id.* at 770.

[15] *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (quoting *United States v. Roetcisoender*, 792 F.3d 547, 550 (5th Cir. 2015)).

[16] *United States v. Sorrells*, 145 F.3d 744, 753 (5th Cir. 1998) (quoting *United States v. Gallo*, 927 F.2d 815, 822 (5th Cir. 1991)).

criminal intent of the principal."[17]  "Participation means that the defendant engaged in some affirmative conduct designed to aid the venture.  Although relevant, mere presence and association are insufficient to sustain a conviction of aiding and abetting."[18]

## A

With regard to aiding and abetting health care fraud, the Government

> must prove beyond a reasonable doubt that the defendant "knowingly and willfully execute[d], or attempt[ed] to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services."[19]

Kelly-Tuorila does not dispute that Smith or Haigler engaged in health care fraud.  Rather, she argues that she did not aid and abet them.

Kelly-Tuorila asserts that "[t]he government did not present sufficient evidence to prove . . . that [she] acted with the specific intent required to support a conviction for Count 2," i.e. that "she knew the claim was fraudulent but . . . process[ed] and submitt[ed] the claim . . . with intent to further the fraud."  She asserts that she "simply act[ed] as a biller."  However, the evidence supporting Kelly-Tuorila's conspiracy conviction is also sufficient to support her substantive health care fraud conviction.[20]  Specifically, that evidence

---

[17] *Id.* (quoting *United States v. Salazar*, 66 F.3d 723, 729 (5th Cir. 1995)).

[18] *Id.* (quoting *Salazar*, 66 F.3d at 729).

[19] *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014) (alterations in original) (quoting *United States v. Imo*, 739 F.3d 226, 235-36 (5th Cir. 2014)).

[20] *See Imo*, 739 F.3d at 237 (the health care fraud convictions against the defendant were affirmed based on the evidence of conspiracy); *see also Willett*, 751 F.3d at 340-43 (analyzing the sufficiency of the evidence for health care fraud and conspiracy to commit health care fraud together).

No. 17-50512

includes: (1) Kelly-Tuorila's confession; (2) Agent McLoy's and Agent Gutierrez's testimony; (3) evidence that Kelly-Tuorila ordered scooters but did not submit a single claim for scooters; and (4) evidence that Kelly-Tuorila submitted claims for power wheelchairs when she knew DTS was providing scooters. This evidence was sufficient for the jury to convict Kelly-Tuorila of aiding and abetting health care fraud.

**B**

Kelly-Tuorila was convicted under counts three through thirteen of aiding and abetting aggravated identity theft. The underlying crime requires the Government to prove that the defendant "(1) knowingly used (2) the means of identification of another person (3) without lawful authority (4) during and in relation to a felony enumerated in 18 U.S.C. § 1028A(c)."[21] The Government's theory is that DTS would use, "without lawful authority, the names, NPI numbers, and signatures of physicians to fraudulently claim that doctors had prescribed the power wheelchairs." More specifically, the Government argues that by submitting the claims (with a prescribing physician's NPI number) and by using the "KX" modifier, Kelly-Tuorila verified that (1) the services on the form were medically necessary according to an identified doctor and (2) the medically necessary information from that doctor was on file.

Kelly-Tuorila maintains that she did not have "the specific intent to further the crime of identity theft." She asserts that "[t]here was no direct evidence that she was aware that the claims she submitted used, without authority, the names and signatures of the doctors listed in the indictment." She also argues that there was no evidence that she "knew that any paperwork

---

[21] *United States v. Mahmood*, 820 F.3d 177, 187 (5th Cir. 2016).

she received with these doctor's names and signatures were forgeries or were otherwise unauthorized." Instead, she "merely relied on the paperwork as submitted."

The Government presented evidence that "[she] knew approximately 1000 claims submitted to be fraudulent." That would include *all* of DTS's fraudulently submitted claims. There was evidence that Kelly-Tuorila knew DTS was submitting claims for power wheelchairs but providing customers with power scooters. The Government presented evidence that Kelly-Tuorila submitted claims for unprescribed power wheelchairs and used the "KX" code on those claims, thereby representing that a physician prescribed the power wheelchairs and that the documentation was on file. From these facts, the jury could reasonably infer that Kelly-Tuorila knew that a physician did not actually prescribe the power wheelchairs she billed for, but she nevertheless submitted claims.

Kelly-Tuorila contests a specific count related to Dr. Gary Becker, contending there was evidence that he prescribed a power wheelchair. However, Dr. Becker testified that he prescribed a manual wheelchair, not a power wheelchair. The prescription submitted to Medicaid, dated February 25, 2009 and containing Dr. Becker's signature, prescribed a power wheelchair along with several wheelchair accessories. Dr. Becker testified that he would not have signed the second prescription for a power wheelchair. Kelly-Tuorila signed the prescription faxed into Medicaid on the block for DTS as the DME provider. She dated the document February 10, 2009, even though Dr. Becker did not sign any prescription until February 25. In signing the document, Kelly-Tuorila acknowledged that she was certifying the form. But when questioned about the issue, she could not explain how she could certify the form as being true on February 10, fifteen days before Dr. Becker signed it.

No. 17-50512

Moreover, the altered prescription contained five pages of supporting documentation from a VA therapist signed April 14, 2009. But the VA therapist is not the prescribing physician, and even if the VA therapist did prescribe the power wheelchair, she did not see the patient until almost two months after the prescription was signed. Viewing that evidence in the light most favorable to the prosecution, a rational jury could conclude beyond a reasonable doubt that Kelly-Tuorila knew that Dr. Becker did not prescribe the power wheelchair when she submitted the claim to Medicaid.

## C

Kelly-Tuorila was convicted of counts fourteen through twenty-one of aiding and abetting in making false statements related to health care. The underlying crime requires the Government to prove that "(1) the defendant made a materially false, fictitious, or fraudulent statement or misrepresentation; (2) in connection with the delivery of [or payment for] health care benefits; and (3) [s]he did so knowingly and wilfully."[22]

Kelly-Tuorila contends that she did not know DTS was making false statements, asserting that she "rel[ied] in good faith on the documents she received at face value" and "handled the administrative task of billing" like any other biller would. The evidence contradicts this. The Government presented evidence that: (1) Kelly-Tuorila confessed to knowing that approximately 1,000 submitted claims were fraudulent; (2) she gave Agents McLoy and Gutierrez more information than they independently knew about the fraudulent activity; and (3) she ordered scooters knowing that DTS did not make a claim for any of those scooters. Viewing that evidence in the light most favorable to the

---

[22] *United States v. Dailey*, 868 F.3d 322, 330 (5th Cir. 2017) (first alteration in original) (citing 18 U.S.C. § 1035).

prosecution, a rational jury could determine beyond a reasonable doubt that Kelly-Tuorila shared the criminal intent of Smith and Haigler, participated in the criminal venture, and sought to make it succeed by submitting claims that she knew contained false information.

*    *    *

For the foregoing reasons, we AFFIRM the district court's judgment.