# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-31017

United States Court of Appeals
Fifth Circuit

**FILED**

February 13, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JOE ANN MURTHIL; ROY E. BERKOWITZ; BARBARA SMITH,

Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:13-CR-101-8

Before HIGGINBOTHAM, JONES, and HAYNES, Circuit Judges.

PER CURIAM: *

Defendants-Appellants Joe Ann Murthil, Roy Berkowitz, and Barbara Smith appeal their convictions for healthcare fraud and related crimes for their roles in a broad conspiracy to defraud Medicare organized by Mark Morad. Murthil and Smith also challenge their sentences. We AFFIRM the district court's judgment in all respects.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-31017

## I.  Background

In 2014, Morad and a host of others were charged in a superseding indictment arising out of a healthcare fraud scheme. After accepting a plea agreement, Morad became the Government's key witness at trial.

Murthil was indicted for conspiracy to commit healthcare fraud under 18 U.S.C. § 1349, conspiracy to pay and receive healthcare kickbacks under 18 U.S.C. § 371, and healthcare fraud under 18 U.S.C. § 1347.  Berkowitz and Smith were indicted for conspiracy to commit healthcare fraud under 18 U.S.C. § 1349 and healthcare fraud under 18 U.S.C. § 1347.  Unlike Morad and many of the other defendants charged in the indictment, Murthil, Berkowitz, and Smith did not accept a plea.[1]

An authorized Medicare provider may bill Medicare for covered services provided to eligible beneficiaries.  Home healthcare is a covered service.  To qualify for home healthcare coverage, a patient must be homebound, under a doctor's care, and require skilled nursing.  A patient is homebound if he is unable to leave the home frequently or for long periods of time without assistance.  It is not enough that a patient uses a cane, walker, or wheelchair to get around.

In order to bill Medicare for homebound care, a home healthcare agency must complete certain forms on which a doctor certifies that the patient is homebound and under the doctor's care.  A skilled caregiver, frequently a nurse, must also fill out an assessment of the patient's condition after the nurse treats the patient.  This assessment determines how much the home healthcare agency is paid.

---

[1] Defendant Beverly Breaux was also indicted, charged, and convicted but was dismissed from this appeal.

2

No. 15-31017

Morad owned and operated a handful of healthcare organizations, including home healthcare agencies—Interlink and Memorial—and a doctor's office—Medical Specialists of New Orleans.  Morad testified that the fraud proceeded as follows: (1) the entities recruited individuals to be patients by paying kickbacks to recruiters, (2) doctors from Medical Specialists certified the recruited patients by exaggerating their medical needs, and (3) the home healthcare agencies billed the Government for the unneeded care.  Specifically, they provided care to patients who were not homebound.

Murthil was the office manager at Memorial, and there was testimony that everybody at Memorial reported to her.  Murthil kept track of payments to Memorial's recruiters and the patients they referred.  Her duties included assigning patients to nurses for treatment and billing Medicare for services.  Morad testified that "she was the only person that I trusted [at Memorial]."

Smith and Berkowitz worked as doctors for Medical Specialists, certifying patients for home healthcare services.  The doctors were paid $75 each time they certified a patient for home healthcare treatment.  There was also testimony that patient evaluations were cursory and that doctors used forms that were already filled out by recruiters.  Furthermore, there was testimony that the nurses employed by Morad engaged in "negative charting"—creating an illusion that their patients were actually sick—by including vague and incorrect diagnoses.  Other evidence against the Defendants is discussed more fully below.

At the Government's request, the jury was given the Fifth Circuit's

3

No. 15-31017

pattern jury instruction 1.37A for deliberate ignorance.[2]  Murthil objected to this instruction, arguing that the evidentiary basis for it had not been established.  The court overruled her objection.

Murthil, Berkowitz, and Smith were all convicted of every count for which they were charged in the indictment.  Murthil was sentenced to concurrent terms of forty-eight months' imprisonment, followed by three years of supervised release.  Murthil's sentence was partially based on the district court's conclusion the offense involved an intended loss of $14,153,419. Berkowitz was sentenced to concurrent terms of sixty-four months' imprisonment, followed by two years of supervised release.  Smith was sentenced to concurrent terms of eighty months' imprisonment, followed by two years of supervised release.  Smith's sentence was partially based on the district court's conclusion that the offense involved an intended loss of $11,629,437.15.  Murthil, Smith, and Berkowitz timely appealed.

## II.  Standard of Review

"This court reviews preserved challenges to the sufficiency of the evidence de novo." *United States v. Alaniz*, 726 F.3d 586, 600 (5th Cir. 2013) (citation omitted).  For sufficiency of the evidence challenges, a reviewing court "must affirm a conviction if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable

---

[2] The jury was instructed as follows:

You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 300–01 (5th Cir. 2014) (en banc). "We review the trial court's decision to issue a deliberate ignorance instruction for abuse of discretion." *United States v. Miller*, 588 F.3d 897, 905 (5th Cir. 2009) (citing *United States v. Orji-Nwosu*, 549 F.3d 1005, 1008 (5th Cir. 2008)).

We review appeals based on unpreserved evidentiary challenges for plain error. *United States v. Fullwood*, 342 F.3d 409, 413 (5th Cir. 2003) (citing FED. R. CRIM. P. 52(b); *United States v. Garcia-Flores*, 246 F.3d 451, 457 (5th Cir. 2001)). "Plain error exists if (1) there is an error, (2) the error is plain, . . . (3) the error affect[s] substantial rights[,] and (4) the error seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings." *United States v. Gordon*, 838 F.3d 597, 604 (5th Cir. 2016) (first and third alterations in original) (quoting *United States v. Garcia–Carrillo*, 749 F.3d 376, 378 (5th Cir. 2014)). The fourth prong is discretionary. *See Puckett v. United States*, 556 U.S. 129, 135 (2009).

Where a sentencing error is preserved, we first consider whether the district court committed a significant procedural error, such as miscalculating the Guidelines range. *United States v. Odom*, 694 F.3d 544, 547 (5th Cir. 2012) (quoting *United States v. Delgado–Martinez,* 564 F.3d 750, 752 (5th Cir. 2009)). "If there is no error or the error is harmless, this court may proceed to the second step and review the substantive reasonableness of the sentence imposed for an abuse of discretion." *Id.* (citation omitted). Generally, we review "the district court's interpretation and application of the Guidelines de novo, and the district court's factual findings . . . for clear error." *Id.* at 546–57 (citation omitted). "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole." *United States v. Valdez*, 453 F.3d 252,

No. 15-31017

262 (5th Cir. 2006) (quoting *United States v. Villanueva,* 408 F.3d 193, 203 n.9 (5th Cir. 2005)).

## III. Discussion

### A. Sufficiency of the Evidence

Murthil and Berkowitz challenge the sufficiency of the evidence supporting their convictions. We evaluate each defendant's argument in turn.

#### 1. Murthil

Murthil argues that the Government did not prove beyond a reasonable doubt that she knowingly entered into a conspiracy to commit healthcare fraud under 18 U.S.C. § 1349,[3] that she knowingly committed healthcare fraud under 18 U.S.C. § 1347,[4] and that she knowingly provided illegal kickbacks under 18 U.S.C. § 371.[5] Murthil understands that "her actions furthered the aims of Morad's conspiracy," however, the way she sees it, she was a "pawn"

---

[3] To prove the crime of conspiracy to commit healthcare fraud under 18 U.S.C. § 1349, the Government must prove beyond a reasonable doubt that "(1) two or more persons made an agreement to commit [healthcare] fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully." *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014) (quoting *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012)).

[4] "To prove health-care fraud in violation of 18 U.S.C. § 1347, the [G]overnment must prove beyond a reasonable doubt that the defendant 'knowingly and willfully execute[d], or attempt[ed] to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.'" *Willett*, 751 F.3d at 339 (quoting *United States v. Umawa Oke Imo*, 739 F.3d 226, 235–36 (5th Cir. 2014)).

[5] To prove the crime of conspiracy to pay and receive kickbacks under 18 U.S.C. § 371, the Government must prove beyond a reasonable doubt "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Njoku*, 737 F.3d 55, 63–64 (5th Cir. 2013) (quoting *United States v. Mauskar*, 557 F.3d 219, 229 (5th Cir. 2009)).

that the other conspirators took advantage of "because she did her job without asking questions."

The Government presented evidence that Murthil knew the unlawful purpose of Morad's conspiracy to defraud Medicare, that she herself knowingly defrauded Medicare, and that she knew the unlawful purpose of the conspiracy to pay kickbacks. *See Willet*, 751 F.3d at 339; *Njoku*, 737 F.3d at 63–64. Because the conspiracy to pay healthcare kickbacks was associated with the larger conspiracy to defraud Medicare, much of the evidence is overlapping.

The Government presented testimony that Murthil, the office manager at Memorial, had two decades of experience in the home healthcare field and that, in her role as the person in charge of billing, Murthil understood the healthcare regulations.  Among other evidence, Morad testified that Murthil knew her patients came from recruiters, not from doctor's referrals, that Murthil understood that clients were not homebound, and that it was Murthil's responsibility to keep track of and reassign non-homebound patients away from nurses who were unwilling to risk their licenses by treating non-homebound patients to nurses who were willing to treat and recertify such patients.  Based on the totality of this evidence in the extensive record, we conclude that a rational trier of fact could have found that Murthil was knowingly complicit in Morad's scheme to defraud Medicare.

With respect to Murthil's conviction for substantive fraud under 18 U.S.C. § 1347, the evidence is also sufficient.  Morad testified that Murthil was responsible for billing Medicare and that Medicare was billed for patient Joann Bush, despite Murthil and Morad having earlier discussed that Bush was not homebound.

No. 15-31017

As to Murthil's knowledge that the checks she gave to patient recruiters were illegal kickbacks under 18 U.S.C. § 371, among other evidence, Morad testified that he had conversations with Murthil regarding the impropriety of selling Medicare numbers and about paying kickbacks to recruiters.  He also testified that a recruiter was allowed to give patient information only to Murthil, "the only person that [he] trusted" because he "did not want anyone else in the office to know that [he] was paying kickbacks to [a recruiter] or that's how [they] were getting [their] patients."

A reasonable juror could conclude, based on the above testimony, including the fact that Murthil had twenty years of home healthcare experience, that Murthil knew it was illegal to make these kinds of payments to patient recruiters.  Therefore, we affirm the district court's judgment as to Murthil's sufficiency of the evidence arguments.

### 2.  Berkowitz

Berkowitz also challenges the jury's finding regarding the element of knowledge.  Similarly to Murthil, he argues that the Government failed to prove he knew of the unlawful purpose of Morad's conspiracy under 18 U.S.C. § 1349 and that he knowingly and willfully defrauded Medicare under 18 U.S.C. § 1347.

The jury heard testimony that Morad paid the doctors at Medical Specialists only if they certified the patient for home healthcare services.  Furthermore, there was testimony that Berkowitz, while working for Medical Specialists, spent about ten to fifteen minutes "at most" with each new patient, that he never asked about the patient's ability to leave home, and that he never performed a physical exam to see if the new patient was mobile.  Nevertheless, Berkowitz certified these patients for home healthcare.  Berkowitz admitted

that he knew some of the patients he was certifying as homebound were not homebound.  He also admitted that certification forms that he signed were already filled out by Morad's staff.  Based upon Berkowitz's admissions and the testimony of other co-conspirators, a reasonable juror could conclude that Berkowitz knowingly and willingly joined in an agreement to commit healthcare fraud under 18 U.S.C. § 1349.

The Government also proved that Berkowitz intended to defraud Medicare by prescribing medically unnecessary services to patient Carl Outman in violation of 18 U.S.C § 1347.  The jury heard evidence that demonstrated Berkowitz knew Outman was not homebound.  This evidence, along with testimony that Berkowitz knew that some of the patients he was certifying as homebound were not homebound, is sufficient to show Berkowitz certified Outman for treatment knowing that such treatment was not needed.

*B. Deliberate Ignorance Instruction*

Murthil also argues that the district court abused its discretion in issuing a "deliberate ignorance" instruction.  Continuing her defense that she was merely a pawn in Morad's illegal scheme, Murthil contends that the Government did not establish an evidentiary basis for the instruction because "there is no evidence that [] Murthil put her head in the sand to avoid learning of [the fraudulent scheme]."

We "consistently uphold[] instructions of deliberate ignorance if they have the required factual basis." *United States v. Delgado*, 668 F.3d 219, 227 (5th Cir. 2012) (citation omitted).  However, even assuming arguendo that this instruction was error, we conclude that the error was harmless because, as explained above, the Government presented substantial evidence of Murthil's actual knowledge.  *See United States v. St. Junius*, 739 F.3d 193, 204–05 (5th

Cir. 2013) (holding that "[e]ven if the district court errs in its decision to give the deliberate ignorance instruction, any such error is harmless where substantial evidence of actual knowledge is presented." (quoting *Miller,* 588 F.3d at 906)).

### C. Summary Testimony

In her appeal, Defendant Barbara Smith argues that the district court erred by permitting FBI Agent Glenn J. Methvin, Jr. to summarize portions of prior witness testimony at the conclusion of the Government's case-in-chief. Specifically, Smith argues that Agent Methvin, on multiple occasions, impermissibly reiterated prior witness testimony detailing the alleged conspiracy and that some of these reiterations falsely characterized the prior testimony. She also argues that these errors were harmful because the Government's other evidence failed to demonstrate fraud. Because Smith did not object to Agent Methvin's testimony at trial, the district court's admission of Methvin's testimony is reviewed for plain error. *Fullwood*, 342 F.3d at 413 (citations omitted).

Federal Rule of Evidence 1006 states that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot conveniently be examined in court." While this rule does not address summary witnesses, "[f]or complex cases, we have allowed summary witnesses in a limited capacity." *Fullwood*, 342 F.3d at 413. Here, Agent Methvin prepared charts analyzing relevant Medicare claims and comparing those claims to certain national averages. While explaining his analysis and charts, Agent Methvin was repeatedly asked whether he recalled prior testimony of other witnesses. For example, Agent Methvin created a chart comparing the average number of home healthcare

episodes for Morad's patients to the national average and contextualized the chart by referencing an earlier witness's testimony that established the national average.

Given its relative complexity, this is the type of case which allows for summary testimony of relevant records, *see Fullwood*, 409 F.3d at 414 (collecting cases), and some contextualization under these circumstances is not improper. Furthermore, all of the testimony Agent Methvin referenced came from other witnesses who had previously established the testimony, and we conclude that it was not materially misleading. *See United States v. Nguyen*, 504 F.3d 561, 572 (5th Cir. 2007).

But even if the district court did err, it did not result in substantial harm to Smith. Agent Methvin's testimony was not mentioned during closing argument. His testimony was part of the Government's case-in-chief, rather than as a final rebuttal witness, which allowed the defense to put on four witnesses after him and before jury deliberations. *Cf. Fullwood*, 342 F.3d at 413–14. Furthermore, given the evidence of Smith's guilty knowledge, we conclude that Smith did not meet her burden of showing that the alleged erroneously admitted evidence was harmful. In other words, Smith "failed to demonstrate a reasonable probability that the outcome of [her] trial would have been different" had Agent Methvin not adduced the summary testimony. *United States v. Morin*, 627 F.3d 985, 1000 (5th Cir. 2010).[6]

---

[6] For these same reasons, even if we concluded that Smith's substantial rights were affected, we would refuse to use our discretion to overturn this jury verdict under the fourth prong of plain error review.

No. 15-31017

*D. Sentencing*

Murthil and Smith challenge the district court's imposition of their sentences.  We evaluate each defendant's arguments in turn.

1. Murthil

Murthil was sentenced to 48 months, well below the Guidelines range of 108-135 months based on the Probation Office's determination of an offense level 31.  Nevertheless, she first challenges her sentence by arguing that the district court erred when it failed to provide her with a reduced role reduction under U.S.S.G. § 3B1.2 for her claimed "minimal" role in the conspiracy.  Specifically, she argues that the district court did not consider Murthil's eligibility under § 3B1.2 and its revised commentary, stating that "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative."  U.S.S.G. § 3B1.2 cmt. n.3(C).

We find no error in the district court's application of § 3B1.2.  In denying Murthil's objection, the court noted, among other things, that "the [G]overnment elicited testimony that [Murthil] was Memorial's primary biller, [and that] she understood clients for which she submitted Medicare claims were not . . . homebound."   It is evident from the court's statements that the district court concluded that Murthil understood the fraudulent scheme to a large degree and had a large role in the operation, whether she had control over the plans or not.  Based on these not implausible findings, we conclude that the court did not abuse its discretion by refusing to grant Murthil's reduction request.

Murthil next challenges her sentence by arguing that the district court relied too heavily on the loss amount in imposing a sentence under 18 U.S.C. § 3553(a).  Specifically, she argues that "because the district court found her

responsible for an actual loss of $14,147,295, the base offense level—and her corresponding Guidelines range—skyrocketed by twenty levels" pursuant to U.S.S.G § 2B1.1(b)(1)(K). Although the district court's sentence of forty-eight months was substantially below the applicable Guidelines range, Murthil questions whether a lengthy prison sentence should be imposed at all. She does not, however, question the court's calculations and does not argue that the court refused to evaluate all of the 18 U.S.C. § 3553(a) factors in making its determination. She simply disagrees with their application.

In determining her sentence, the district court listened to Murthil's arguments for a lesser sentence and considered all of the factors under § 3553(a). Furthermore, "the sentencing judge is in a superior position to find facts and judge their import under § 3553(a) with respect to a particular defendant." *United States v. Campos–Maldonado*, 531 F.3d 337, 339 (5th Cir. 2008). The district court did not abuse its discretion in sentencing Murthil as it did.

### 2. Smith

Smith also challenges her sentence. Unlike Murthil, she argues that the district court miscalculated the loss amount attributable to her under U.S.S.G. § 2B1.1(b)(1)(K). Specifically, she contends that the loss amount of $11,629,437.15 calculated by the court represents thousands of bills submitted over a period of years, whereas at trial, only two specific patients Smith treated were discussed in any detail. She thus argues that the Government did not meet its burden of proving the loss amount.

"A district court's loss calculation, and its embedded determination that the loss amount was reasonably foreseeable to the defendant, are factual findings reviewed for clear error." *United States v. Brown*, 727 F.3d 329, 341

(5th Cir. 2013) (citation omitted). In healthcare fraud cases, "the amount fraudulently billed to Medicare[] is prima facie evidence of the amount of loss [the defendant] intended to cause." *United States v. Valdez*, 726 F.3d 684, 696 (5th Cir. 2013) (second alteration in original) (citation omitted). As Smith correctly notes, we have held "that where the fraud is so pervasive that separating legitimate from fraudulent conduct 'is not reasonably practicable, the burden shifts to the defendant' to prove any legitimate amounts." *United States v. St. John*, 625 F. App'x 661, 668 (5th Cir. 2015)[7] (quoting *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012)), *cert. denied*, 136 S. Ct. 911 and *cert. denied*, 136 S. Ct. 912 (2016).

Evidence at trial showed that the vast majority of patients at Medical Specialists—where Smith worked—did not need home healthcare services and received "little or no benefit" from those services. We find this fraud to be extensive and pervasive. *Cf. United States v. Nelson*, 732 F.3d 504, 522 (5th Cir. 2013). Therefore, the district court correctly placed the presumption of the amount fraudulently billed to Medicare on Smith. Because Smith made no showing that any particular service billed was legitimate, we find that the district court did not err in its calculation. Accordingly, we affirm.

AFFIRMED.

---

[7] Although *St. John* is not "controlling precedent," it "may be [cited as] persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (citing 5TH CIR. R. 47.5.4).