# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
February 24, 2021

Lyle W. Cayce
Clerk

No. 18-31078

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

JONATHON NORA,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:15-CR-61-8

Before HIGGINBOTHAM, JONES, and HIGGINSON, *Circuit Judges*.
STEPHEN A. HIGGINSON, *Circuit Judge*:

A jury convicted Appellant Jonathon Nora of three crimes: conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count 1); conspiracy to pay or receive illegal health care kickbacks, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(2) (Count 2); and aiding and abetting health care fraud, in violation of 18 U.S.C. §§ 1347 and 2 (Count 27). Nora challenges his convictions as based on insufficient evidence. We REVERSE his convictions and VACATE his sentence.

No. 18-31078

## I. Background

While Nora is the sole appellant in this case, he was not alone at trial. Nora was tried and convicted alongside five codefendants for his involvement in a large home health care fraud and kickback scheme in connection with his employment at Abide Home Health Care Services, Inc. His codefendants— Dr. Shelton Barnes, Dr. Michael Jones, Dr. Henry Evans, Dr. Gregory Molden, and Paula Jones—also appealed their convictions, but their case was resolved by a separate panel of this court in *United States v. Barnes*, 979 F.3d 283 (5th Cir. 2020). That panel affirmed the codefendants' convictions. *Id.* at 292. In doing so, it also described the nature of the fraud and kickback schemes run out of Abide, the facts of which are also relevant to Nora's appeal. *Id.* at 292-94. We thus borrow *Barnes*'s description of the overall schemes before turning our focus to Nora's specific role at Abide.

As described in *Barnes*:

> Dr. Shelton Barnes, Dr. Michael Jones, Dr. Henry Evans, Paula Jones, and Dr. Gregory Molden were each previously employed by Abide Home Care Services, Inc., a home health agency owned by Lisa Crinel. Barnes, Michael Jones, Evans, and Molden served as "house doctors." In that role, the physicians referred patients to Abide for home health care services. Paula Jones, Michael Jones's wife, was one of Abide's billers. As a biller, Jones would process Medicare filings. She would use the Kinnser billing system (Kinnser) to ensure that all appropriate documentation existed for each bill. As part of Abide's business model, it would "provide home health services to qualified patients and then bill Medicare accordingly."

> Medicare reimburses providers for home health care services if a particular patient is (1) eligible for Medicare and (2) meets certain requirements. Those requirements include, *inter alia*, that the patient is "'homebound,' under a certifying

2

No. 18-31078

doctor's care, and in need of skilled services." Certifying a patient for home health care begins with an initial referral, which typically originates with the patient's primary care physician. Next, "a nurse goes to the patient's home to assess if [he or] she is homebound, completing an Outcome and Assessment Information Set [ (OASIS) ]." From the OASIS assessment, the nurse develops a plan of care on a form known as a "485" for the prescribing physician's review. Only a physician can approve a 485 plan. Physicians are expected to review the forms to ensure they are accurate. These forms, as well as a face-to-face addendum certifying that the nurse met with the patient, are then routed to Medicare. This process permits payment for one 60-day episode. Patients can then be recertified for subsequent episodes.

Medicare determines how much will be paid for each episode based, in part, on the patient's diagnosis. Each diagnosis has a corresponding code derived from the International Statistical Classification of Diseases and Related Health Problems 9th Revision (an ICD-9 code). Reimbursements are higher for some diagnoses than others. So-called "case-mix diagnoses" such as rheumatoid arthritis, cerebral lipidosis, and low vision, receive higher payments than other, comparatively simpler diagnoses. As a result, false or erroneous entries on the OASIS form can ultimately result in higher Medicare reimbursements.

The government came to suspect that Abide was committing health care fraud. Specifically, the government alleged that "Abide billed Medicare based on plans of care that doctors authorized for medically unnecessary home health services." According to the government, several patients who had received home health care from Abide did not, in fact, need such services. Each physician had "approved [case-mix] diagnoses to patients on . . . 485s that were medically unsupported." Paula Jones had also participated in the scheme. Through Kinnser, Abide employees were able to predict how much Medicare would reimburse for a particular

episode of home health care. If the episode did not meet Abide's "break-even point," Jones would send "the files back to the case managers to see if they could get the score up." These and other actions "fraudulently inflated Medicare's reimbursement to Abide."

Relatedly, the government also came to suspect that Abide was "pay[ing] doctors, directly or indirectly, for referring patients." The government alleged that Crinel (the owner of Abide) had paid the physicians for patient referrals. Some of these payments were "disguised as compensation for services performed as [medical directors]" for Abide. The government also alleged that Paula Jones's salary, which had doubled during her time working for Abide, was based on her husband's referrals. This conduct, the government alleged, constituted a violation of 42 U.S.C. §§ 1320a-7b(b)(1), (b)(2)—the anti-kickback statute.

*Barnes*, 979 F.3d at 292-93 (quoting *United States v. Ganji*, 880 F.3d 760, 764, 777 (5th Cir. 2018)).

In addition to Nora and his codefendants at trial, the Government alleged that many others participated in the fraud. In total, the Government indicted 23 individuals. Several pleaded guilty instead of going to trial, including Crinel—the head of Abide and chief orchestrator of the fraud. As part of her plea bargain, Crinel agreed to cooperate with the Government and to testify at trial against Nora and his codefendants. The trial lasted 21 days and included evidence relating to Nora's role at Abide and his purported involvement in the fraud and kickback schemes.

Nora began working at Abide on October 6, 2009, when Crinel hired him to be a full-time data entry clerk earning $13 an hour. At the time, Nora was 22 years old and had a high school degree along with some college credits. On September 27, 2012, he was promoted to the position of office manager and began earning an annual salary of $60,000. Nora continued to work at

No. 18-31078

Abide through March 25, 2014, the date the Government executed a number of search warrants on Abide. Notably, Nora remained salaried throughout his employment at Abide and the Government points to no evidence that he received other compensation.

In this role, Nora coordinated new patient intake and admissions. To begin the processing of a new patient, Nora would field calls from referrers of potential new patients. Nora would then collect that patient's Medicare or other insurance information to verify her benefits covered Abide's services. He would then assign a nurse to conduct an evaluation of the patient's eligibility for home health care. If the nurse approved the patient for care, Nora would then assign a field nurse to make the regular home health visits. Nora also helped with the data entry of forms generated during this process, such as the OASIS forms and 485s completed by reviewing nurses and case managers.

Abide received patient referrals from a variety of sources, including from its own house doctors and other employees, as well as outside doctors and other non-employees. Abide also engaged in various marketing practices to identify potential patients, such as by sending recruiters to local health fairs. Nora was among those assigned to follow up with potential patients identified by recruiters. Nora would call these potential patients, reintroduce Abide, and ask about their interest in home health care. If the potential patient was interested and had her own doctor, Nora would contact that doctor to see if the doctor approved of home health services for the patient. If the doctor did approve, the doctor would send a referral form to Nora, who would in turn submit it to Abide's reviewing nurses. If the potential patient did not have her own doctor, Nora would offer the patient the services of one of Abide's house doctors, who could review the patient's suitability for home health care. In addition, when a potential patient had her own doctor, but the doctor did not think home health care was appropriate for that patient, Nora

would follow up with the patient to inform her of her doctor's recommendation. Nora would also tell these patients that they might still be eligible for home health care, but that they would need to be evaluated by a different doctor. If the patient remained interested in Abide's services notwithstanding her own doctor's recommendation, Nora would offer to assign the patient to one of Abide's house doctors for a separate evaluation of her eligibility.

Beyond the admissions process, Nora was responsible for scheduling home nursing visits for the patients and processing the visit notes. He also helped track patient recertifications.

The evidence at trial showed that Nora's role entangled him, to some extent, in three practices that were central to Abide's fraud and kickback schemes.

The first was Abide's use of house doctors. As the court in *Barnes* described (in the excerpt above), Abide would rely on its house doctors to approve medically unnecessary plans of care so that it could bill Medicare for patients who would otherwise not qualify for home health services. By virtue of his role in assigning prospective patients to these house doctors, the Government contended that Nora was complicit in this practice.

The second was Abide's pay-for-referral system. As just discussed, Abide relied on referrals to acquire new patients. And when a referral successfully resulted in a new patient, Abide would pay the person who made the referral. The Government contended at trial that these referral payments were illegal "kickbacks" in violation of 42 U.S.C. § 1320a-7b(b). There was abundant evidence at trial showing that Nora was involved in processing these payments and that he knew they were for patient referrals. Nora helped maintain a log of referrals and would inform the referrers that their referred patient had been admitted and that they could thus receive compensation in

return. Nora was also sometimes instructed to deliver referral payment checks to those who had made successful referrals.

The third practice at Abide in which Nora was involved was known as "ghosting." As described above by the court in *Barnes*, when a patient satisfies Medicare's requirements for home health services, Medicare will approve payment for one 60-day episode of care. Should the patient need additional care beyond that episode, they can be recertified for additional 60-day episodes. However, as Crinel explained at trial, home health is intended to be a temporary benefit and it raises a "red flag" to Medicare if a patient is re-certified for too many episodes in a row.

To avoid suspicion, Crinel instituted a system whereby patients would be "ghosted." Here's how ghosting worked: once a patient had been in Abide's system for "a couple of years," Abide would officially discharge the patient but informally hold onto them, with the assigned nurses continuing to make home visits. From the patient's perspective, nothing had changed and thus the patient had no incentive to leave Abide and seek home health services elsewhere. But from Medicare's perspective, this patient was no longer receiving services from Abide. While a patient was being ghosted, Abide would not bill that patient or charge Medicare. When Abide's nurses would visit a ghosted patient, instead of entering the visit data into Abide's electronic record system as was done for formal visits, the nurses submitted a paper note to record the visit. After 60 days, the ghosted patient would be re-enrolled as an official patient and Abide would resume billing Medicare.

In contrast to Nora's involvement in the pay-for-referral scheme, it is not clear what Nora's responsibilities were with respect to ghosting. Crinel maintained a list of patients who needed to be ghosted and would send that list to Gaynell Leal, a case manager at Abide, and to Nora. It is not clear what Nora would do once he received that list, but the evidence suggests he was at

No. 18-31078

least aware of what was happening (in the sense that he knew patients were being discharged but still treated by Abide's nurses[1]) and helped make scheduling changes to facilitate the practice. For example, Leal testified that after receiving the list from Crinel, she wrote up a note describing that a certain patient should be discharged and then brought back at a later date. She gave that note to Nora so that he could, in his capacity as a scheduler, inform the patient's assigned nurse that the patient had been discharged but that the nurse should continue making visits and turning in paper notes recording the visit data. Leal also testified that "[e]veryone in the office" knew about ghosting.

Beyond Nora's general involvement in Abide's practices, the Government also introduced evidence related to one of Abide's patients named "EvLa." Nora's purported involvement with EvLa's experience at Abide formed the basis of his conviction for aiding and abetting health care fraud (Count 27).

EvLa was a patient at a group home that referred its patients to Abide for home health services. The owner of the group home, Verinese Sutton, testified that—as a general matter—when she wanted to refer a patient to Abide she would sometimes call Nora to make the referral. After receiving the referral, Nora would send a nurse from Abide to assess the patient and would then refer the patient to Dr. Michael Jones, one of Abide's house doctors. Sutton also described that when she went to Abide to pick up her referral payments, Nora would usually be the one to hand her the checks.

Separately, Sutton also testified that EvLa was one of her group home patients who received home health care services from Abide. EvLa was under

---

[1] As will be discussed below, it is a separate question whether Nora was aware of the unlawful *purpose* behind ghosting.

the care of Dr. Jones. Other evidence was introduced at trial that showed that EvLa was not actually homebound and that she was thus ineligible for home health care.

Aside from the evidence describing Nora's general involvement in sometimes fielding Sutton's referrals to Abide and his handling of Sutton's payments, there is no specific evidence about whether he was involved with EvLa's experience at Abide or with her treatment by Dr. Jones.

At the conclusion of the Government's case-in-chief, Nora moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, which the district court denied without particularizing evidence of Nora's knowledge of the unlawfulness of Abide's practices. Just as he had not made any opening argument, Nora did not call any defense witnesses. The jury then returned its verdict convicting Nora on all three counts. Following the verdict, Nora renewed his motion for judgment of acquittal, and in the alternative, moved for a new trial. The district court denied the motion, again without pointing to particularized evidence of Nora's knowledge of the unlawfulness of Abide's practices.

The district court sentenced Nora to a concurrent sentence of 40 months' imprisonment on each count, followed by one year of supervised release. This was a downward variance from the Guidelines range because the court found that "the loss calculation overstated [Nora's] participation." The court also ordered Nora to pay restitution to Medicare in the amount of $12,921,797.

Nora filed a timely notice of appeal.

No. 18-31078

## II. Legal Standard

As he argued to the district court in his Rule 29 motions, Nora asserts here that his convictions are not supported by sufficient evidence.

> Where, as here, a defendant has timely moved for a judgment of acquittal, this court reviews challenges to the sufficiency of the evidence *de novo*. Though *de novo*, this review is nevertheless highly deferential to the verdict. Because of the shortcomings inherent in examining a cold appellate record without the benefit of the dramatic insights gained from watching the trial, we review the evidence and all reasonable inferences in the light most favorable to the prosecution and to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*United States v. Nicholson*, 961 F.3d 328, 338 (5th Cir. 2020) (internal quotation marks and citations omitted).

## III. Discussion

There is no dispute that Nora worked at Abide while fraud and kickback schemes occurred, but what *is* in dispute is whether Nora knew that his work was unlawful. Or, legally, whether there was sufficient evidence introduced at trial for a rational juror to conclude beyond a reasonable doubt that Nora acted "willfully" to defraud Medicare or to pay illegal health care kickbacks.

18 U.S.C. § 1347(a)(1) makes it a crime to "knowingly and willfully . . . defraud any health care benefit program." 18 U.S.C. § 1349 extends that liability to those who conspire to defraud a health care benefit program.

42 U.S.C. § 1320a-7b(b)(2), the anti-kickback statute, makes it a crime to "knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate)" to induce someone to refer an individual to a

No. 18-31078

health care provider for which payment may be made under a federal health care program.

"As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.' In other words, in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)).[2]

Although the precise meaning of the term "willfully" can vary depending on the context, *id.* at 191, this court has held that the general understanding of the term applies to its use in the general health care fraud statute and the health care anti-kickback statute. *See, e.g.*, *United States v. Ricard*, 922 F.3d 639, 648 (5th Cir. 2019) ("Willfulness in the Medicare kickback statute means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." (internal quotation marks and citation omitted)); *United States v. St. John*, 625 F. App'x 661, 666 (5th Cir. 2015) (per curiam) (accepting the district court's § 1347 willfulness instruction, which stated that "willfully . . . means that the act was committed voluntarily or purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law" (alteration in original)); *see also United States v. Willett*, 751 F.3d 335,

---

[2] The Court in *Bryan* also described the general definition of "knowingly" when used in the criminal context. *Bryan*, 524 U.S. at 193 ("[U]nless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense.").

339 (5th Cir. 2014) (holding that § 1347 requires "specific intent to defraud").[3]

Neither conspiracy nor aider and abettor liability lowers this *mens rea* requirement. Conspiracy "has two intent elements—intent to further the unlawful purpose and the level of intent required for proving the underlying substantive offense." *United States v. Brooks*, 681 F.3d 678, 699 (5th Cir. 2012); *see also Willett*, 751 F.3d at 339 ("To prove a conspiracy to commit health-care fraud in violation of 18 U.S.C. § 1349, the government must prove . . . that the defendant joined in the agreement willfully, that is, with intent to further the unlawful purpose." (internal quotation marks and citation omitted)). And aider and abettor liability under 18 U.S.C. § 2 "results from the existence of a community of unlawful intent between the aider or abettor and the principal." *United States v. Sanders*, 952 F.3d 263, 277 (5th Cir. 2020). In other words, an aider and abettor must share the same level of intent as the principal. *United States v. Williams*, 985 F.2d 749, 755 (5th Cir. 1993).

Nora argued throughout his trial and now to us that he "did not have the intent, knowledge, nor awareness of an illegal health care fraud scheme or illegal health care kickbacks at Abide required to convict him . . . ." For example, he argues that while he may have understood that Abide was

---

[3] Importantly, with this general definition of willfulness, for a defendant to act with knowledge that his conduct is unlawful does *not* require him to have awareness of the *specific* law he is charged with violating. Congress has made clear that such a heightened showing is not required to convict a defendant of committing health care fraud or paying illegal health care kick-backs; both statutes were amended in 2010 to specify that "a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 18 U.S.C. § 1347(b); 42 U.S.C. § 1320a-7b(h); *see also John*, 625 F. App'x at 666. *See generally* Robb DeGraw, *Defining "Willful" Remuneration*, 14 J. L. & Health 271 (2000) (discussing various interpretations of "willful" in the context of the anti-kickback statute and in criminal law more broadly).

making referral payments for new patients, there was no evidence at trial that proved that he *knew* these payments constituted unlawful kickbacks. He argues the same is true with respect to his role in the various practices that constituted Abide's fraud on Medicare and with respect to Abide's treatment of EvLa.

We agree. While the Government presented evidence at trial detailing Nora's role at Abide and his work responsibilities, the evidence did not prove that Nora understood Abide's various practices and schemes to be fraudulent or unlawful, and thus there was insufficient evidence to conclude that Nora acted with "bad purpose" in carrying out his responsibilities at Abide. Furthermore, the evidence the Government points to as suggestive of Nora's understanding of the unlawful nature of his work at Abide fails upon close inspection.

For example, the Government argues that Nora "received training on compliance, Medicare, and home health," with the implication being that this training alerted him to the unlawful nature of Abide's practices. But the evidence cited in support of this assertion comprises two pieces of paper of limited probative value.

The first is a one-page certificate that states that Nora "has successfully completed" the "2013 Palmetto GBA Home Health Workshop Series" sponsored by the "HomeCare Association of Louisiana" which is described as an "approved provider of continuing nursing education." The certificate states that the workshop lasted for four hours. Through the testimony of an investigating agent, the Government only further elicited that this was a "home-health-specific training" and that Palmetto GBA was a Medicare contractor. There is no evidence about what this training entailed or if it discussed health care laws or Medicare regulations at all, let alone regulations about kickbacks or activity relating to "ghosting."

No. 18-31078

The second piece of evidence is an Abide form signed by Nora on October 29, 2009, that states that Nora "participated with the compliance program" and has "been briefed on compliance." It also states that Nora has "been made aware that if [Nora] know[s] of any fraudulent behavior and/or abuse of any kind, [he] is to report this behavior to the CEO and/or DON/Administrator as soon as possible." Again, there is no description of what this compliance program entailed.

In addition, the Government cites the fact that Nora would attend regular staff meetings at Abide, where among other things, "any changes to Medicare regulations" were discussed. There is no further evidence about what regulations were discussed at these meetings.

This evidence is insufficient. A juror would have to make a speculative leap about the content of these trainings and meetings—that they somehow alerted Nora to the unlawfulness of Abide's practices and the actions he took to support them. A rational juror would need more to conclude that Nora acted "willfully."

Of course, formal trainings were not the only route for Nora to learn about health care regulations or the impropriety of Abide's practices. He could have learned directly from his colleagues. Indeed, Nora worked with individuals at Abide who clearly understood that Abide was engaging in widespread unlawful and fraudulent activity. Gaynell Leal, for example, testified that she knew that Abide engaged in "ghosting" in order to avoid "draw[ing] a red flag to Medicare." And Crinel, of course, knew that Nora's work helped Abide elude health care regulations.

Both Leal and Crinel testified *for the Government* to explain Abide's schemes. Yet neither person (nor anyone else, for that matter) testified that Nora understood the unlawful or fraudulent purpose behind Abide's practices. Neither testified that she had had a conversation with Nora about

avoiding red flags, or the illicitness of referral payments, or that the house doctors unlawfully approved medically unnecessary plans of care.

Leal testified that "[e]veryone in the office" knew about ghosting. But Leal goes no further than that. We do not know whether everyone in the office knew just that Abide engaged in that practice, or whether everyone in the office knew that the practice was employed to evade Medicare regulations. Arguably, the "ghosting" practice is inherently suspicious. But even if a reasonable person in Nora's shoes should have known (or at least suspected) that ghosting was unlawful, that would only make Nora guilty of negligently participating in a fraud—it does not prove that Nora acted "willfully" in facilitating ghosting and the fraud it furthered. *See United States v. Crow*, 504 F. App'x 285, 287 (5th Cir. 2012) (per curiam) (describing that negligence could not give rise to liability for health care fraud where the statute required the defendant act "knowingly and willfully").

Similarly, Crinel testified that there was a "culture" at Abide "that [Abide] needed to hold on to [its] patients so [it] [could] make payroll" and that medical necessity did not matter. She also described that she once threatened to fire Leal and Nora when they had discharged a patient. Crinel's testimony isn't worthless—if an organization has a pervasive culture of disregard for the rules, that can lend credence to the case that an individual member of that organization is aware of wrongdoing. This type of "everybody knew" testimony can thus bolster a case that an individual acted willfully. But here, it just isn't enough. These two general statements about a business operating in a health care industry subject to a complex system of laws and regulations cannot impute "bad purpose" to all 150 employees who worked there.

Comparing the evidence presented against Nora in this case to the evidence presented in a similar case against a similarly situated defendant

further reveals what is lacking here. In *United States v. Murthil*, the defendant, Joe Ann Murthil, was the office manager at Memorial, a home health care provider. 679 F. App'x 343, 347 (5th Cir. 2017) (per curiam). Memorial was run by Mark Morad, who used it to orchestrate a broad health care fraud and kickback scheme similar to the one run by Crinel out of Abide. *See id.* at 346-47. And like Crinel here, Morad was the Government's key witness at trial. *Id.* at 346. For her role in Morad's schemes, Murthil was convicted of conspiracy to commit health care fraud, conspiracy to pay health care kickbacks, and substantive health care fraud—an identical slate of convictions to Nora's. *Id.* On appeal, Murthil argued that there was insufficient evidence to conclude that she acted with the requisite level of intent. *Id.* at 348-49. She argued that she was a "'pawn' that the other conspirators took advantage of 'because she did her job without asking questions.'" *Id.*

In affirming Murthil's convictions, this court explained that:

> The Government presented testimony that Murthil, the office manager at Memorial, had two decades of experience in the home healthcare field and that, in her role as the person in charge of billing, Murthil understood the healthcare regulations. Among other evidence, Morad testified that Murthil knew her patients came from recruiters, not from doctor's referrals, that Murthil understood that clients were not homebound, and that it was Murthil's responsibility to keep track of and reassign non-homebound patients away from nurses who were unwilling to risk their licenses by treating non-homebound patients to nurses who were willing to treat and recertify such patients. Based on the totality of this evidence in the extensive record, we conclude that a rational trier of fact could have found that Murthil was knowingly complicit in Morad's scheme to defraud Medicare.
>
> . . .

No. 18-31078

As to Murthil's knowledge that the checks she gave to patient recruiters were illegal kickbacks under 18 U.S.C. § 371, among other evidence, Morad testified that he had conversations with Murthil regarding the impropriety of selling Medicare numbers and about paying kickbacks to recruiters. He also testified that a recruiter was allowed to give patient information only to Murthil, "the only person that [he] trusted" because he "did not want anyone else in the office to know that [he] was paying kickbacks to [a recruiter] or that's how [they] were getting [their] patients."

*Id.* at 349.

Thus, in *Murthil*, the Government had presented evidence that (1) Murthil had 20 years of experience in the home health care field and understood Medicare regulations due to her role handling billing, (2) she knew patients were not homebound and reassigned those patients to nurses who were willing to risk their licenses, (3) she had had conversations with Morad about the impropriety of paying kickbacks to recruiters, and (4) she was the only one trusted by Morad—the chief facilitator of the fraud.

Nora, by contrast, joined Abide at age 22 with a high school degree. He did not handle billing. The Government identifies no evidence that he knew that any of Abide's patients were not actually homebound, or that he knew he was assigning patients to nurses or doctors who were willing to run afoul of regulations and risk their licenses. Crinel, cooperating with the Government, never testified that she had any conversations with Nora about the impropriety of Abide's practices, nor that Nora served as a co-conspirator.[4] That the Government had the cooperation of the chief orchestrator of

---

[4] Indeed, after its oral argument before this panel, the Government appropriately notified the court that it had made an overstatement during oral argument, when it asserted that Crinel had testified specifically that Nora knew about the fraud. She had not done so.

Abide's fraud but nevertheless failed to elicit testimony directly establishing the knowing complicity of Nora is especially telling.

Perhaps recognizing the absence of specific evidence demonstrating Nora's knowledge of the unlawfulness of Abide's practices, the Government argues that because Nora worked for five years at Abide and his role put him near many of its fraudulent or illegal practices, "it is difficult to believe that he was oblivious to what was happening at Abide or his role in it." In support, it cites decisions of this court for the purported principle that "proximity" to fraudulent activities alone can support an inference of knowledge of unlawfulness.

It is true that this court has held that "proximity to the fraudulent activities" can lead to an inference of knowledge of fraud. *See, e.g.*, *Willett*, 751 F.3d at 340; *see also United States v. Thompson*, 761 F. App'x 283, 291 (5th Cir. 2019) (per curiam) (finding the defendant's "repeated exposure to the fraud" to be probative of his knowledge). But in those cases, the defendants' "proximity" to fraud was probative because it directly exposed them to dishonest and fraudulent behavior. For example, in *Willett*, the question was whether the defendant knew about the fraudulent "upcoding" of equipment bills sent to Medicare. 751 F.3d at 340. There, the Government introduced evidence that the defendant, after delivering equipment to hospitals and receiving confirmatory delivery tickets in return, would then be present (i.e., in "proximity") while his co-conspirator (who was also his wife of 35 years) "ripped off or doctored codes on the delivery tickets," or wrote in codes where there were no existing codes. *Id.* Moreover, in these cases, there was

other evidence separate from "proximity" that proved the defendants' knowledge of the fraud.[5]

Here, as already described, other evidence of Nora's knowledge is lacking. And the Government's argument about Nora's "proximity" to the fraud taking place at Abide is devoid of specifics—it does not identify evidence showing that Nora directly observed, or deliberately closed his eyes to, fraudulent behavior such that a rational juror could infer that he knew about Abide's fraud. Therefore, Nora's "proximity" to Abide's fraudulent practices does not supply sufficient evidence to convict him.

In sum, even under our extremely deferential review of jury verdicts, there was insufficient evidence put forth at trial for a rational juror to conclude beyond a reasonable doubt that Nora acted with the knowledge that his conduct was unlawful. The Government thus failed to prove that Nora acted "willfully" with respect to each count. Specifically, there was insufficient evidence proving (1) that Nora knew that Abide was defrauding Medicare, through "ghosting," its use of house doctors, or otherwise (Count 1); (2) that Nora knew that Abide's referral payments constituted illegal kickbacks

---

[5] For example, in *Willett*, a witness also testified that she had overheard the defendant and his wife having a suspicious conversation that suggested they were engaging in wrongdoing and collaborating together. 751 F.3d at 340. In *Thompson*, there was evidence that the defendant—a medical marketer—would drive "fully ambulatory" patients to the doctor and watch them "get in and out of her non-wheelchair accessible car," all before referring those same patients to the doctor as needing the use of powered wheelchairs. 761 F. App'x at 291. In *United States v. Martinez*, in addition to citing the defendants' proximity to the fraud, this court also pointed to the existence of direct video evidence showing the defendants had engaged in fraudulent medical procedures and submitted false claims. 921 F.3d 452, 469, 471 (5th Cir. 2019). Moreover, there was testimony that the non-doctor defendant in *Martinez* would make patient referral payments by placing the cash behind a bathroom medicine cabinet, for the recipient to collect. *Id.* at 467. In upholding her conviction, the court pointed to this deceptive practice as evidence that she knew of the illegality of the payments. *Id.*

(Count 2); or (3) that Nora had involvement with EvLa's treatment at Abide (let alone that he knew she was not actually homebound) (Count 27).

## IV. Conclusion

For the foregoing reasons, we REVERSE Nora's convictions for conspiracy to commit health care fraud (Count 1), conspiracy to pay illegal health care kickbacks (Count 2), and aiding and abetting health care fraud (Count 27). We therefore also VACATE his sentence.